

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2001

# Tice v. Centre Area Transportation Authority

Precedential or Non-Precedential:

Docket 00-1753

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Tice v. Centre Area Transportation Authority" (2001). *2001 Decisions.* Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1753

RANDY L. TICE, Appellant

v.

CENTRE AREA TRANSPORTATION AUTHORITY;
AMERICAN FEDERATION OF STATE, COUNTY ,
AND MUNICIPAL EMPLOYEES, COUNCIL 83;
AMERICAN FEDERATION OF STATE, COUNTY ,
AND MUNICIPAL EMPLOYEES, LOCAL 1203-b

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 98-cv-01755)
District Judge: Honorable James F. McClur e, Jr.

Argued: March 8, 2001

Before: BECKER, Chief Judge, McKEE, and
STAPLETON, Circuit Judges.

(Filed: April 23, 2001)

        MICHAEL J. ZICOLELLO, ESQUIRE
          (ARGUED)
        Schemery & Zicolello
        330 Pine Street
        One Executive Plaza, Suite 201
        Williamsport, PA 17701

        Counsel for Appellant

ROBERT L. MARTIN, ESQUIRE
JOHN U. BAKER, ESQUIRE
  (ARGUED)
Lee, Martin, Green & Reiter, Inc.
101 Innovation Blvd., Suite 311
State College, PA 16803

Counsel for Appellee Centre Area
Transportation Authority

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by Plaintiff Randy L. T ice from the District Court's grant of summary judgment in favor of Defendant Centre Area Transportation Authority of State College (CATA) in Tice's action for damages under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. S 12101 et seq. Tice advances thr ee claims: (1) that CATA discriminated against him on the basis of disability by discharging him, on a pretextual basis, in October 1996; (2) that CATA discriminated against him by r equiring an improper medical examination as a condition of his return to work in June 1996; and (3) that CATA failed to safeguard his medical records properly. This appeal requires us to interpret for the first time the ADA's pr ovisions regarding permissible and impermissible medical examinations and inquiries, located at 42 U.S.C. S 12112(d).

Firstly, in deciding Tice's claim of discriminatory discharge, we must determine whether T ice was "disabled" within the meaning of the Act. This requir es us to decide whether a plaintiff can establish that he is "regarded as" disabled by his employer solely by virtue of the employer's request for a medical examination. Secondly, in the disposition of Tice's alternative claim that he was subject to an improper medical examination, we must consider the scope of the limitations placed by the ADA on employer-mandated medical examinations and inquiries. Thir dly, Tice's last claim requires us to consider whether a violation of the ADA's provisions regarding the confidentiality of medical records constitutes a per se compensable injury.

2

We ultimately conclude that an employer's r equest for a medical examination, standing alone, is not sufficient to establish that the employer "regarded" the employee as disabled, and thus cannot itself form the basis for establishing membership in the protected class under the ADA. As a result, Tice's claim of discriminatory discharge fails. We interpret the ADA to per mit medical examinations and inquiries upon a showing by the employer of job-relatedness and business necessity, and, because CATA has made such a showing in this case (which T ice has failed to rebut), we conclude that his claim of discrimination by way of an improper medical examination must also fail. Finally, we join several of our sister circuits in holding that a plaintiff alleging a violation of the ADA's recordkeeping and examination requir ements must demonstrate the existence of some actual damage in order to maintain his or her suit. Because Tice has not demonstrated that he suffered any injury as a result of CATA's recordkeeping violations, he cannot prevail on this claim. Therefore, we will affirm the judgment of the District Court.

I. Facts

Randy Tice has a long and checkered employment history with CATA. Therefore, because determinations under the ADA are quite fact-specific, we must r ecount much of the minutiae of Tice's odyssey through CA TA's medical leave procedures.

Tice began his employment with CAT A as a bus driver in 1988. During the relevant periods of Tice's employment, CATA's collective bargaining agr eement (CBA) with the American Federation of State, County and Municipal Employees Local 1203-B (the Union) allowed employees with serious injuries or illnesses to take up to two consecutive years of unpaid leave (while continuing to accrue seniority) for any single medical condition. If the employee did not return to work after two years, the employee would be deemed to have "voluntarily r esigned" under the terms of the CBA. However, if an employee were to return to work before the expiration of the two years and then leave again for the same illness or injury, the return

3

would only interrupt the two-year time clock if that employee worked for a minimum of six weeks befor e going back on leave. CATA's policy was to r equire that after taking such leave, the employee only be permitted to return after submitting a "Return to Work Certificate" from a treating physician, affirming that the employee was physically fit to resume his or her duties.

In October 1993, Tice was injured at a McDonald's restaurant when a utility room door opened suddenly and struck him in the back. He continued to work until February 1994, when he informed CAT A that back problems resulting from the injury r equired him to take medical leave. Tice remained on leave thr oughout 1994 and all of 1995, except for a few brief periods when he attempted to return to his job but quickly discovered that his back injuries would not allow him to continue. His last such attempt took place for several weeks fr om September to October 1994, after which time he submitted to CA TA a note from Dr. Wayne Stokes stating that Tice was "to be off work until further notice and evaluation by sur geon." Subsequently, Tice submitted periodic updates on his condition to CATA, including a letter fr om a surgeon, Dr. Keith Kuhlengel, recommending that Tice r eceive back surgery. In the exchange of correspondence, CATA reminded Tice that if he desired to return to work, he would need to submit a doctor's note certifying that he could perform his duties without risk.

In April 1996, Tice informed CAT A that in July he would be undergoing the back surgery r ecommended by Dr. Kuhlengel; however, in early June, Tice advised CATA that he had canceled his surgery and submitted a Return to Work Certificate, signed by Dr. Kuhlengel, stating that Tice could return to work if given an "air ride seat with lumbar support, power steering, lumbar work belt, 8 hr/day." The certification did not comment on the safety of T ice's return, either to himself or to his passengers.

CATA requested further information from Dr. Kuhlengel before allowing Tice to retur n and, after an initial exchange of letters, CATA informed Tice that he would be required to submit to an Independent Medical Examination (IME) before he could be reinstated. No CA TA employee before (or

4

since) had ever been required to submit to an IME after taking medical leave, and CATA had not war ned Tice of such a possibility in its earlier correspondence.

Tice filed a number of grievances with the Union regarding the delay in reinstatement. At this time, Tice also complained that CATA's method of r ecordkeeping improperly commingled confidential medical information with nonconfidential personnel information, in violation of the ADA's recordkeeping requir ements. See 42 U.S.C. S 12112(d)(4)(C). In the course of union grievance procedures, CATA admitted that it had inadvertently failed to comply with the ADA's recordkeeping r equirements, but promised to modify its policies. After these violations were remedied, the Union withdrew this grievance.

Tice submitted to the IME in August 1996, and was diagnosed with "lumbar spondylolysis with degenerate disc disease." The examining physician stated that with exercise and medication, Tice would nonetheless be able to work, and he returned to his job on August 21, 1996. He then settled his grievance with CATA regar ding the IME. The seniority he had accrued while on leave entitled him to bid on driving routes with newer buses that wer e equipped with the seating and steering accommodations he r equired.

Tice worked for CATA for a month (fr om August 1996 to September 1996). However, on September 24, 1996, Tice was injured in an automobile accident unr elated to his employment with CATA, and submitted to CA TA a note from Dr. Stokes stating that he would not be able to continue to work because he had "sustained a shoulder contusion and bursitis and reexacerbation of his back pain."

In October 1996, Tice's two-year period of leave was close to expiring because his brief return did not meet the six-week minimum required under the CBA. CA TA informed Tice that he would be deemed to have voluntarily resigned if he did not return by October 24, 1996. In response, on October 24, Tice submitted a note from one Dr. Worobec stating that due to a rotator cuff injury incurred in the automobile accident -- ostensibly a new injury, unrelated to the back injury that had originally kept him out of work

5

-- Tice would need to refrain fr om working for another two weeks. A few days later, CATA infor med him that it now considered him to have resigned.

Both during his medical leave from CAT A, and after his termination in October 1996, Tice worked part-time cleaning and restocking for Allegheny Airlines, a job which he held until May 1997. Upon further training, he began work as an airline mechanic, continuing until February 1998, when he injured his knee falling fr om the cockpit of a plane, requiring that his duties be lessened. Tice eventually left this employment because of an inconvenient commute. Subsequent to his employment with CA TA, Tice also ran a ticket-sales operation out of his home.

II. Procedural History

After his termination from CAT A, Tice filed a grievance with the Union. The case was arbitrated in April 1997. The grievance and arbitration dealt only with Tice's allegations that his termination violated the CBA; no char ges of ADA violations were raised or considered. T ice claimed that his absence from work after September 1996 was due to "new" injuries unrelated to his initial back injury, thus entitling him to another two years of leave. In the alter native, Tice argued that CATA's request for an IME in June 1996 -- which resulted in a two-month delay in his r eturn to work -- was improper, and that, had CA TA not engaged in this impermissible action, he would have retur ned to his job in June, thus allowing him to meet the six-week minimum time period to stop the two-year time clock. On July 17, 1997, the arbitrator denied Tice's grievance, finding that the IME had been proper under the CBA, and that Tice's absence from September 1996 to October 1996 was due to the original back injury.

In October 1998, Tice filed suit against CA TA in the District Court for the Middle District of Pennsylvania alleging that CATA had violated the ADA by: (1) discriminating against him on the basis of disability by deliberately "misclassifying" his automobile accident injuries as "new" to justify Tice's discharge in October 1996; (2) discriminating against him by requiring an

6

improper medical examination as a condition of his return to work in June 1996; and (3) failing to safeguar d his medical records properly.1 On May 17, 2000, the District Court granted CATA's motion for summary judgment, holding that Tice was not disabled within the meaning of the ADA, that CATA's request for an IME had not been improper under the ADA, and that Tice could not maintain his action regarding the recor dkeeping because he had failed to demonstrate any injury as a result of the violations. This appeal followed. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331, and we have jurisdiction pursuant to 28 U.S.C. S 1291. W e set forth the familiar summary judgment standard in the mar gin.2

III. Discussion

A. Improper Discharge Under the ADA

The ADA forbids employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. S 12112(a). Tice's first claim is that CATA discriminated against him on the basis of disability by using his injuries incurred in the September 1996 automobile accident as a pretext for his discharge. To state a claim for employment

_____

1. Tice also advanced claims against the Union and additional claims against CATA, alleging, inter alia, that the Union and CATA violated the Americans with Disabilities Act in the terms of the CBA itself, and that the Union breached its duty of fair repr esentation. These claims were not presented on appeal and thus are not befor e us.

2. Summary judgment is proper if ther e is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See F.R.C.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

7

discrimination under the ADA, a plaintiff must demonstrate that he or she is a "qualified individual with a disability" within the meaning of the Act, and that he or she has suffered an adverse employment decision as a result of the discrimination. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111(8). A "disability" is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. S 12102(2). Although the statute does not define the term "major life activities," the EEOC has issued regulations explaining that major life activities are "functions such as caring for oneself, per forming manual tasks, walking, seeing, hearing, speaking, br eathing, learning, and working." 29 C.F.R.S 1630.2(i).3

Tice argues that he is disabled within the meaning of the ADA because: (1) his back injury constitutes an impairment that "substantially limits" the "major life activity" of working; (2) he has a "record" of having such an impairment; and (3) CATA regar ded him as having such an impairment. We address these ar guments in turn.

1. Tice's Back Injury

In Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), the Supreme Court interpreted the phrase"substantially limits" as it is used in the Americans with Disabilities Act.

_____

3. Although the Supreme Court has declined to rule on the degree to which courts must defer to these regulations, see notes 4 and 8, infra, the Court has interpreted and applied these r egulations in its own jurisprudence. See, e.g., Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999).

A plaintiff attempting to establish disability on the basis of "substantial limitation" in the major life activity of "working" must, at minimum, allege that he or she is "unable to work in a broad class of jobs." Id. at 491. The Court explained that "[t]o be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job choice." Id. at 492; see also Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 n.7 (3d Cir. 1998) (en banc).

Tice has not alleged any limitation in the "major life activity" of working caused by his back injuries beyond his inability to drive a bus. In fact, he could not do so: Both before and after his termination from CATA, Tice found employment with an airline, and began operating a ticket sales business out of his home.4 He has not offered any evidence to suggest that his back injuries have caused him any difficulties beyond their interference with his bus driving. Instead, he argues only that if he could not perform his bus driving duties without accommodation, "a jury could reasonably conclude that he was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs." In other words, even Tice himself cannot identify any limitations caused by his injuries

_____

4. Tice argues that the District Court, in determining that he was not disabled, improperly relied in part on his ability to find work as an airline mechanic because, at the time CATA's discriminatory acts were alleged to have taken place, Tice did not have the requisite skills for such work. It is true that under our precedent, the determination as to whether a plaintiff is "substantially limited" in the activity of "working"
is to be made with reference to the plaintiff's particular skills and training. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 784 (3d Cir. 1998). However, we need not determine whether our holding in Mondzelewski -- which relied, in part, on deferring to EEOC regulations -- survives Sutton, see 527 U.S. at 479-80 (holding that the EEOC has not been granted authority to implement the definitional portions of the ADA, but refusing to rule on the degree of deference owed to such regulations), or even whether Mondzelewski would control in a situation such as the one before us, where a plaintiff receives further training after the allegedly discriminatory acts have occurred. This is because even if we disregard the mechanic position, Tice was able to find at least two other jobs, and has failed to allege a limitation on any activity other
than bus driving.

besides the limitation on bus driving, and would have the jury speculate as to whether there might possibly be jobs out there that he cannot perform. One would expect that, at minimum, if an individual is "substantially limited" in a "major life activity," he or she would be conscious of that limitation. Thus, Tice has not created a genuine issue of fact as to whether he suffers from a"disability" within the meaning of the ADA.5

## 2. Record of Disability

In the alternative, Tice submits that he has a "record of disability" based on his back injuries. This contention fails for the same reason that we hold Tice is not currently disabled. A plaintiff attempting to pr ove the existence of a "record" of disability still must demonstrate that the recorded impairment is a "disability" within the meaning of the ADA. Tice has only presented evidence that his impairment limited his ability to drive a bus-- once again, because an impairment that limits only bus driving is not a "disability," Tice has not demonstrated the existence of a record of disability.

_____

5. Tice also comes close to contending that his diagnosis alone -- "lumbar spondylolysis with degenerate disc disease" -- is sufficient to establish disability within the meaning of the Act. However, it is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish "disability." Rather, the inquiry as to disability is to be made on a case-
by-case basis. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999) (holding that although some impairments might invariably be severe enough to substantially limit major life activities, the determination as to the existence of a disability is to be made via assessment of the impact on the particular individual); Olson v. General Elec. Astrospace, 101 F.3d 947, 953 (3d Cir. 1996) (holding that a plaintiff with an undisputed history of serious mental illness was not "substantially limited" in a major life activity). This scheme stands in contrast to the current system of awarding Social Security Disability Insurance benefits, which are granted, in part, upon the demonstration of the existence of one of the specific impair ments listed in the regulations. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999) (comparing the two systems).

10

3. "Regarded as" Disabled Due to Required Medical Examination

Tice further contends that, whether or not he is actually disabled, CATA regarded him as disabled, and thus he can seek the ADA's protection through the"regarded as" definition of "disability." As proof of such regard, Tice points only to the fact that he was requir ed to take an IME when no other employee was forced to do so, even though CATA had the opportunity to consult dir ectly with his doctor. We will address the question whether CATA's IME comported with ADA requirements in Part III.B, infra; in this section, we deal with the distinct (though r elated) issue of whether the request for an IME demonstrates that CATA "regarded" Tice as disabled.

For an individual to be "disabled" under the"regarded as" portion of the ADA's definition of disability, the individual must demonstrate either that: (1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). In either case, the definition of "substantially limits" remains the same as it does in other parts of the statute -- i.e., if the individual is attempting to establish that the employer believed the individual to be limited in the life activity of "working," then "working" must encompass a broad class of jobs. See id. at 489-93; see also Wright v. Illinois Dep't of Corrections, 204 F.3d 727, 731-33 (7th Cir. 2000); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 647 (2d Cir. 1998).6

The ADA also has specific provisions, which we have rescribed in the margin, regar ding the propriety of employer-mandated medical examinations.7 These

_____

6. The EEOC regulations also allow for an individual to establish that he or she is "regarded as" disabled if he or she "[h]as a physical or mental impairment that substantially limits major life activities only as a result
of the attitudes of others toward such impair ment." 29 C.F.R. S 1630.2(l)(2). Tice does not claim to be disabled under this definition.
7. The relevant portions of the statute pr ovide:

(d) Medical examinations and inquiries

11

provisions, which are not a model of legislative clarity, see Yin v. California, 95 F.3d 864, 868 (9th Cir. 1996), may leave an odd "gap" in setting out the scope of permissible examinations and inquiries. The Act expressly allows examinations or inquiries as to whether an employee has a disability or as to the severity of a disability, if such examinations/inquiries are job-related and consistent with business necessity. See 42 U.S.C. S 12112(d)(4)(A). The Act also explicitly permits "inquiries" (but not examinations) as to an employee's ability to "perfor m job-related functions." 42 U.S.C. S 12112(d)(4)(B). However, the Act is unclear as to whether examinations (rather than inquiries) are permissible if intended to evaluate the employee's ability to perform job-related functions, even if such examinations are not intended to discover whether an employee is "disabled" within the meaning of the Act, as permitted in S 12112(d)(4)(A).

The EEOC regulations clarify the statute by explaining that "[a] covered entity may requir e a medical examination

_____

       (1) In general

     The prohibition against discrimination as r eferred to in subsection
     (a) of this section shall include medical examinations and inquiries.

       . . .

       (4) Examination and inquiry

       (A) Prohibited examinations and inquiries

       A covered entity shall not require a medical examination and shall
       not make inquiries of an employee as to whether such employee
       is an individual with a disability or as to the nature or severity
of
       the disability, unless such examination or inquiry is shown to be
       job-related and consistent with business necessity.

       (B) Acceptable examinations and inquiries

       A covered entity may conduct voluntary medical examinations,
       including voluntary medical histories, which ar e part of an
       employee health program available to employees at that work site.
       A covered entity may make inquiries into the ability of an
       employee to perform job-related functions.

42 U.S.C. S 12112(d).

(and/or inquiry) of an employee that is job-r elated and consistent with business necessity." 29 C.F .R. S 1630.14(c).8 Under these standards, a request for an IME that complies with the statutory restrictions will never , in the absence of other evidence, be sufficient to demonstrate that an employer "regarded" the employee as substantially limited in a major life activity, simply because an examination that is "job-related" and "consistent with business necessity" must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue. Cf. Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811-12 (6th Cir. 1999). A r equest for such an appropriately-tailored examination only establishes that the employer harbors doubts (not certainties) with respect to an employee's ability to perform a particular job. Doubts alone do not demonstrate that the employee was held in any particular regard, see Colwell, 158 F.3d at 647, and, as we have explained, inability to perform a particular job is not a disability within the meaning of the Act, see Sullivan, 197 F.3d at 811. Accord Wright , 204 F.3d at 732-33 (request for an examination does not establish that an employer

---

8. Although in Sutton, the Supreme Court reserved the question whether the EEOC had been granted congressional authority to issue implementing regulations under 42 U.S.C. SS 12111-12117, and thus whether the regulations are owed defer ence under Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984), we ourselves have held that EEOC implementing r egulations are owed "substantial deference" under Chevron. Deane v. Pocono Med. Ctr., 142 F.3d 138, 143 n.4 (3d Cir. 1998) (en banc). As we explained in note 4, supra, the Supreme Court expressly held in Sutton that the EEOC had not been given authority to issue implementing r egulations for Chevron purposes with regard to SS 12101-12102 of the ADA, while simultaneously allowing for the possibility that the EEOC was given such authority with regard to SS12111-12117. See Sutton, 527 U.S. at 478-79. Therefore, although we do not decide whether our holding in Pocono with respect to deference owed to regulations issued under SS12101-12102 survives Sutton, we do believe that our holding with respect to deference for regulations implementing S 12112(d) remains intact. Thus, we defer to the EEOC's interpr etation of S 12112(d) to permit examinations and inquiries that, although perhaps not intended to discover whether an employee is "disabled" within the meaning of the ADA, are job-related and consistent with business necessity.

13

regarded an employee as disabled wher e all the evidence suggested that the employer merely had doubts about the employee's abilities solely with respect to the physical demands of a single job); Cody v. Cigna Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir . 1998) (request for a mental examination of an employee who had exhibited strange behaviors does not establish that the employer "regarded" the employee as disabled because "[e]mployers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims").

Indeed, even an improper IME r equest, without more, might not be sufficient to demonstrate that an employee was "regarded as" disabled. This is because an inquiry into how an employee was "regarded" is necessarily quite fact-specific, and all of the surrounding cir cumstances may be relevant in reaching a conclusion. So, for instance, if the IME is improper only for the reasons T ice has alleged -- i.e., because the employer already had sufficient information from other sources to gauge the employee's fitness for work -- such facts, standing alone, would not necessarily be determinative of how the employee was "regarded."

At all events, this is not to say that a request for an IME, proper or improper, may not, taken in conjunction with other evidence or circumstances surrounding the request, establish that the employer regarded the employee as disabled. The important point is that the request and surrounding circumstances must establish that the employee was "regarded as" disabled within the meaning of the ADA. See Sutton, 527 U.S. at 490-93. So, for example, if it turned out that the employer's examination was not limited to an assessment of those potential impair ments that had occasioned the examination in the first place, but instead became a "wide-ranging assessment of mental or physical debilitation," Sullivan, 197 F .3d at 812, such evidence might be highly probative as to the nature of the employer's perception. Further, a r equest for an examination, taken in conjunction with evidence suggesting that the employer had no reasonable basis for harboring doubts about the employee's ability to do his or her job in

14

the first place, might also be probative as to the nature of the employer's regard. Thus, for Tice to use CATA's request for an IME to establish that CATA "regarded" him as substantially limited in the major life activity of working, he must raise a genuine issue of fact as to whether CATA's request evinced a belief that Tice was unable to work in a "broad class of jobs."

Tice has not even attempted to make such a showing. On the contrary, he has explicitly argued in his briefing only that "CATA believed Tice's impairment precluded him from working as a bus driver." Further, it is undisputed that CATA's inquiries of Tice's doctor, and the IME itself, all focused solely on the physical requirements of bus driving.[9]

Therefore, even if CATA believed Tice to be unable to drive a bus, such a regard would still not establish that CATA regarded him as disabled. Because there has been no other evidence besides the request for an IME submitted to establish the nature of CATA's "regard" for Tice, we hold that Tice has not put forth sufficient evidence to create an issue of fact as to his entitlement to ADA protection. Thus, Tice has failed to make out the first element of a prima facie case of ADA discrimination, i.e., that of "disability," and his claim that CATA deliberately misclassified his injuries in order to effect a discriminatory discharge fails.

B. The Propriety of the Independent Medical Examination

Tice's next ADA claim is that CATA violated the provisions of 42 U.S.C. S 12112(d)(4) by requesting a medical examination that was not consistent with business necessity. Tice alleges that this improper examination resulted in an injury to him, because the delay occasioned by the requirement prevented him from working for the

_____

9. For instance, on July 10, 1996, CATA wrote to Dr. Kuhlengel with a list of tasks that a bus driver must be able to perform (such as assisting
wheelchair users, climbing in and out of the bus, and operating all hand and foot controls), and asked for Dr. Kuhlengel's opinion as to Tice's ability to perform these tasks. Tice does not argue, and there is no evidence to suggest, that CATA inquired about any physical limitations beyond those demonstrably relevant to his job.

15

minimum six weeks necessary to interrupt the expiration of his two years of medical leave, eventually r esulting in his discharge. Therefore, Tice r equests monetary damages to remedy the alleged violation.

We have held that Tice is not "disabled" within the meaning of the ADA, and it is not clear from the text of the ADA itself whether nondisabled individuals ar e permitted to sue for violations of S 12112(d). See, e.g., Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir . 1999) (declining to reach the question whether nondisabled individuals have a cause of action for violations of S 12112(d)); Armstrong v. Turner Indus., 141 F.3d 554, 559 (5th Cir. 1998) (same). As have many of our sister circuits, we leave for another day the question whether the ADA permits nondisabled individuals to sue, because it is clear that in this case, CATA's requirement of an IME was permissible under the statute. The evidence surrounding CAT A's request amply demonstrates that the examination was consistent with business necessity, and Tice has submitted virtually no evidence of his own in rebuttal.

Throughout the course of his dealings with CA TA, Tice complained of severe pain and difficulty walking to the point of requiring "narcotic" medication. Moreover, he had apparently experienced "spasms" that interfered with his use of his legs such that CATA had r eceived complaints about reckless driving. There is no question that such a history raised legitimate safety concerns about Tice's ability to drive a bus. Tice does not even appear to dispute that CATA had cause to inquire about his medical condition. Rather, Tice submits that CAT A should have been content with being permitted to question Dr. Kuhlengel instead of forcing Tice to undergo a new medical examination. Therefore, we will review the infor mation CATA had at the time of its request for an IME.

In July 1995, during Tice's medical leave, Dr . Kuhlengel wrote to CATA explaining that if T ice were to receive surgery, his chances of being able to r eturn to his job were "good to excellent," but that if he did not r eceive surgery, "his prognosis for return to full duties is limited." In April 1996, Tice informed CATA that he would be undergoing surgery in July of that year, but in June he submitted the

16

note from Dr. Kuhlengel stating that he could perform his duties with special seating. Around this time, he also informed CATA that he had canceled the planned surgery. While Tice was on leave, CATA informed him that to return, he would be required to submit doctor's certification that he could drive without risk. The certificate actually submitted did not mention risk or the safety of Tice or of his passengers, and, in fact, a supplement to the certificate was sent a few days later stating that Tice would be able to "man new lift equipped buses with associated duties as tolerated" (emphasis added). When CATA requested that Dr. Kuhlengel provide more information about Tice's condition, Dr. Kuhlengel explained by letter that "I, as you are, am very concerned about passenger safety, and I'm relying on Mr. Tice's assessment of his capabilities, in that he feels he can perform the duties under safe conditions."

Such evidence allows no serious dispute that CATA was fully justified in its decision not to rely exclusively on Dr. Kuhlengel for an assessment of Tice's ability to perform his job. Dr. Kuhlengel had first recommended surgery, and provided no explanation as to his change of opinion. His diagnosis rested largely on Tice's own evaluation of his abilities, and his Return to Work Certificate essentially (and tautologically) stated no more than that Tice would be able to perform his duties as much as Tice could perform them. We believe that, under these facts, CATA's unwillingness to rely on Dr. Kuhlengel's opinion was reasonable, and that its request for an IME was consistent with business necessity in order to ensure the safety of its passengers. See, e.g., Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 809 n.2 (6th Cir. 1999) (once an employee's ability to perform his job has been placed in doubt, an employer may require a medical examination with a doctor of its choosing); Yin v. California, 95 F.3d 864, 868 (9th Cir. 1996) ("[W]hen health problems have had a substantial and injurious impact on an employee's job performance, the employer can require the employee to undergo a physical examination designed to determine his or her ability to work. . . .").

Tice contends that CATA's request for an IME was not consistent with business necessity because CATA had never before or since requested an IME. Tice particularly

17

emphasizes that on one occasion, an employee diagnosed with sleep apnea was permitted to retur n to work after four months' absence with only a doctor's certification as to his abilities. We find this evidence insufficient to create a genuine issue of fact as to the business necessity of CATA's request for an IME from Tice.

The ADA's requirement that an IME be consistent with business necessity is an objective one. Cf. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1119 n.6 (11th Cir. 1993) (explaining that an employer's subjective belief in the "necessity" of a practice with discriminatory impact is not sufficient to escape Title VII liability). That is, even a "good faith" mandatory medical examination by an employer may nevertheless give rise to liability if the court determines that the examination was unwarranted. Cf. T aylor v. Pathmark Stores, Inc., 177 F.3d 180, 193 (3d Cir. 1999) (explaining that there is no "reasonable mistake" defense to a claim of discrimination on the basis of disability where the "mistake" is premised on a generalized misunderstanding of the effects of the plaintiff 's disability). However, an employer's standard practice with regard to medical examinations is certainly relevant evidence of what is "necessary" (as suggested above, CA TA did not usually require them), and, just as we routinely hold that evidence of differential treatment among similarly situated employees is probative on the issue of discrimination in Title VII suits, see, e.g., Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353–54 (3d Cir. 1999), an employer's dif ferential application of a medical examination requirement is r elevant evidence of what is "necessary" to the employer's business.

Nonetheless, we do not believe that Tice has produced evidence sufficient to create a genuine issue of fact as to the necessity of the IME to which he was subject. If we are to compare the application of an IME requirement across employees, we must first establish that the employees are, in fact, similarly situated.10 But Tice has submitted no

_____

10. This is particularly important for ADA claims, because impairments may vary widely across employees, and an employer's animus toward, say, people with mental disabilities may not extend to people who use canes. Likewise, an employment practice that is per fectly permissible

18

details regarding this other (sleepy) employee; we do not know, for instance, the exact nature of that employee's illness, or whether the doctor who signed his Retur n to Work Certificate provided more details about the employee's condition than did Dr. Kuhlengel about T ice's impairment. Tice cannot survive summary judgment on such a minimal record.

Moreover, any comparison between employees must be made with an eye to the ultimate inquiry, i.e., the necessity of the examination of the plaintiff. Although disparate treatment across employees may assist the factfinder in an otherwise uncertain case as to what the job "r eally" requires, it cannot suffice to cr eate an issue of fact as to "necessity" in a case such as this one, wher e the evidence is overwhelming that CATA had good r eason to be doubtful of Tice's abilities and to distrust the opinions of Dr. Kuhlengel.

For these reasons, we conclude that the IME was job-related and fully consistent with business necessity, and will affirm the District Court's grant of summary judgment to CATA on the issue of CATA's compliance with the medical examination provisions of 42 U.S.C.S 12112(d).

C. Confidentiality of Medical Records

Tice's final contention is that the District Court erred in granting summary judgment to CATA r egarding his claim for damages in light of CATA's admitted violation of those ADA provisions governing the confidentiality of medical records. See 42 U.S.C. S 12112(d)(3)(B) & (d)(4)(C) (requiring that medical records be kept separately fr om nonconfidential information, and that access to confidential

_____

with respect to employees with one type of impairment may be impermissible with respect to another impairment. Cf. Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999) (determination as to the existence of a disability is not to be made by blanket r eference to categories of impairments, but instead by case-by-case examination of the impact of the impairment on the individual claimant). Thus, the process of determining which employees are "similarly situated" to a plaintiff so as to allow for a meaningful comparison can be a complicated one.

files be limited). CATA has conceded that it violated the ADA by improperly commingling the medical r ecords of employees with nonconfidential files. After the Union filed a grievance regarding these practices, CA TA brought itself into compliance with the Act, and the Union withdr ew the grievance. Based upon this history, the District Court concluded that Tice had not been "pr ejudiced" and thus could not pursue his claim. We agree, and thus, once again, need not decide in the first instance whether nondisabled individuals are permitted to bring suit for violations of S 12112(d).11

Other courts of appeals have addressed the question whether a plaintiff has a cause of action for a violation of S 12112(d) without demonstrating the existence of an injury-in-fact, either through actual damage (emotional, pecuniary, or otherwise), or through the pr esence of a continuing illegal practice to which plaintif f is likely to be subject absent court intervention. All have concluded that a violation of S 12112(d), without such a showing, presents no "injury" capable of remedy, and thus affords no basis for suit. See Cossette v. Minnesota Power & Light , 188 F.3d 964, 971 (8th Cir. 1999) (remanding for a determination as to whether the improper medical inquiry caused a "tangible injury" capable of supporting the suit); Ar mstrong v. Turner Indus., Inc., 141 F.3d 554, 562-63 (5th Cir. 1998) (dismissing a claim for damages from an allegedly improper

_____

11. Tice interpreted the District Court to have concluded that he was legally "barred" from asserting his claim by first electing to pursue a union remedy. We do not share his understanding of the court's holding. In Alexander v. Gardner-Denver Co. , 415 U.S. 36 (1974), the Supreme Court explained that employees could pursue discrimination claims against their employers both through union grievance procedures and in federal court. In so holding, the Court observed that such a system would not grant "windfall" double-recoveries to plaintiffs, in part because
if the union procedures fully remedy the violation, there will be "no further relief for the court to grant." Id. at n.14. Regardless of whether Alexander's holding with respect to the availability of "dual" fora applies
to ADA claims, cf. Wright v. Universal Mar. Serv. Corp., 525 U.S. 70 (1998) (refusing to decide Alexander's applicability to ADA claims), certainly Alexander establishes that the disposition of a union grievance is relevant to the inquiry as to whether an employee has suffered any remediable injury as a result of the alleged civil rights violations.

medical examination for lack of cognizable injury; no standing for injunctive relief because, despite the presence of continuing employer violations, there was no allegation that this particular plaintiff would again be subject to examination); cf. Griffin v. SteelTek, Inc., 160 F.3d 591, 595 (10th Cir. 1998) (permitting a nondisabled plaintiff to sue for improper medical inquiry because the plaintiff alleged that revelations elicited via the inquiries had caused employer to refuse to hire him, thus r esulting in an injury-in-fact). We ally ourselves with these holdings.12

Beyond the bare allegations of "mental/emotional distress, mental anguish, stress and inconvenience" set forth in his initial complaint, Tice has submitted no evidence as to the actual existence of such har ms as a result of CATA's ADA violations. Indeed, he has not even identified a single person who improperly viewed his medical files. As the Fifth Circuit has stated in the context of preemployment examinations and inquiries, there is no indication in either the text of the ADA or in its history that a technical violation of S 12112(d) was intended to give rise to damages liability. See Armstrong , 141 F.3d at 561. Therefore, we hold that Tice may not maintain his suit against his employer on the ground of impr oper recordkeeping.

For the foregoing reasons, the District Court's grant of summary judgment to CATA will be affir med.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____
12. We do not reach any conclusion with respect to the correctness of these courts' determinations as to whether the plaintiffs in those cases alleged the existence of a redressable "injury" within the meaning of the ADA; we merely agree that in the absence of injury -- however defined -- no claim can lie for a violation of S 12112(d).