**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1626

LEON COURSEY,

                Plaintiff – Appellant,

        v.

UNIVERSITY OF MARYLAND EASTERN SHORE; STATE OF MARYLAND,

                Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Catherine C. Blake, District Judge. (1:11-cv-01957-CCB)

Argued:  March 20, 2014                    Decided:  July 1, 2014

Before TRAXLER, Chief Judge, KING, Circuit Judge, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Robin Ringgold Cockey, COCKEY, BRENNAN & MALONEY, PC, Salisbury, Maryland, for Appellant.  Jennifer L. Katz, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:**  Douglas F. Gansler, Attorney General, Katherine D. Bainbridge, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises from the termination in 2010 of Professor Leon Coursey by his long-term employer, the University of Maryland Eastern Shore ("UMES"). Following his discharge, Dr. Coursey filed this civil action in the District of Maryland, seeking relief from UMES and the State of Maryland. Coursey has alleged multiple claims, including discrimination under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973, as well as retaliatory discharge under the ADA. In April 2013, the district court awarded summary judgment to the defendants on all claims. See Coursey v. Univ. of Md. E. Shore, No. 1:11-cv-01957 (D. Md. Apr. 30, 2013), ECF No. 31 (the "Opinion").[1] Coursey seeks appellate relief from the court's adverse judgment on his ADA and Rehabilitation Act claims. As explained below, however, we affirm.

I.

A.

The summary judgment record reflects that Dr. Coursey joined the UMES faculty in 1972 as Director of Athletics and

---

[1] The district court's unpublished Opinion is found at J.A. 388-401. (Citations herein to "J.A. _____" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

2

Assistant Professor of Physical Education. He was promoted to Associate Professor in 1973, and to full Professor in 2001. During his time at UMES, Coursey served on numerous committees and as Acting Chair of the Department of Physical Education (later called the Department of Exercise Science).

1.

In late 2004, several female students lodged complaints against Dr. Coursey with UMES. Their allegations included that Coursey made inappropriate sexual comments, belittled students in class, graded arbitrarily, and unfairly favored certain students. The UMES Director of Human Resources investigated the complaints and deemed them credible. She further concluded that Coursey had sought to retaliate against students who complained. Coursey was reprimanded and required to participate in sexual harassment training.

In 2007, certain faculty members complained to the UMES administration about Dr. Coursey's erratic and unprofessional behavior, including being overly aggressive with colleagues and disparaging them, often in the presence of students. Faculty members also reported that Coursey did not adhere to UMES policies governing travel, class coverage, and grading. In late 2008 and early 2009, UMES received additional student complaints about Coursey's grading and classroom behavior. Several students also alleged that Coursey was erratic and verbally

3

abusive, asserting that he "was unstable," "had lost it," and "went berserk" on students in class. See J.A. 62-63.

On January 13, 2009, Dr. James Heimdal, Chair of the Exercise Science Department, prepared and sent Dr. Coursey a memorandum summarizing student concerns about his conduct, including "course content, grading/evaluation, and unprofessional behavior," as well as fear "of retaliation from Instructor associated with concerns/complaints." J.A. 60. Heimdal informed Coursey that twelve students had contacted him to voice such concerns, and Heimdal requested a meeting with Coursey "ASAP." Id. There is no indication, however, that such a meeting ever occurred. Shortly after Heimdal sent the memorandum, another faculty member overheard Coursey ranting and yelling at his students, telling them "I am the highest ranking professor on this campus and no one can touch me." Id. at 61.

On February 3, 2009, UMES removed Dr. Coursey from campus and suspended him from his position. As then explained by Dr. Charles Williams, the Vice President of Academic Affairs, UMES had received "several significant complaints regarding [Coursey's] behavior in class," and, to that end, Williams asked Dean Nicholas Blanchard to "perform a full investigation into [the] allegations." J.A. 279. Dr. Williams's letter explained that Coursey would be on paid leave while suspended; he was not to return to campus without prior approval of the UMES

4

administration, nor was he permitted to have contact with "any students, especially those [he had] previously questioned or confronted." Id.[2]

2.

During February 2009, Dean Blanchard investigated the allegations against Dr. Coursey and documented his findings and recommendations by memorandum. Blanchard spoke with several of the complaining students, while others declined to be interviewed. As part of his investigation, Blanchard also met with Coursey. Blanchard observed that, although Coursey was "civil in attitude," his answers in the interview were often unresponsive and vague. See J.A. 309. Blanchard recalled Coursey declaring that people at UMES were "out to get him." Id. Blanchard recommended that Coursey "not be placed back in the classroom," and "highly recommend[ed] that [he] receive a mental health evaluation." Id. at 310.

In the meantime, Dr. Coursey lodged a grievance with the UMES administration, alleging that he had been suspended without

---

[2] Dr. Coursey maintains on appeal that he "was unaware of any allegations of misconduct or complaints regarding his teaching" prior to his February 3, 2009 removal and suspension from campus. See Br. of Appellant 4. That assertion, however, is belied by the record, which includes several copies of Dr. Heimdal's January 13, 2009 memorandum to Coursey. Notably, Coursey has not moved to strike that memorandum, he does not challenge its authenticity, and he has not denied receiving it in January 2009.

5

cause and not given any information about the complaints against him. As a result, UMES convened a faculty grievance board (the "Grievance Board"), which conducted a hearing on May 14, 2009. Two weeks later, on May 29, 2009, the Grievance Board unanimously concluded that UMES had violated the applicable procedures in suspending and investigating Coursey and had failed to advise the complaining students of the appropriate grievance procedures. Accordingly, the Board recommended that Coursey's suspension be lifted, he be allowed to "resume his regular duties," and all of his "rights and privileges be restored." J.A 282.

Pursuant to UMES policy, President Thelma Thompson had the ultimate authority to decide whether to reinstate Dr. Coursey. On June 4, 2009, after reviewing the Grievance Board's recommendations and Dean Blanchard's report, President Thompson requested that Coursey have a "medical evaluation and/or mental health evaluation to ascertain his fitness for duty." J.A. 317.[3] Although the Board had recommended Coursey's reinstatement — without any evaluation — Thompson incorrectly asserted that she

---

[3] Throughout Coursey's employment dispute, the parties have used various terms to describe President Thompson's requested evaluation, including "medical evaluation and/or mental health evaluation," "fitness for duty evaluation," and "mental/medical examination." For consistency, we use the term "mental health evaluation" unless quoting from the record.

6

was acting upon the Board's recommendation in requesting that Coursey undergo a mental health evaluation. See id. at 317, 321. Over the next two months, UMES representatives corresponded with Coursey — through his attorney — about his need to undergo a mental health evaluation before UMES could consider reinstating him for the fall 2009 term. Coursey consistently refused to submit to the evaluation and remained suspended on paid leave.

On October 28, 2009, Dr. Coursey filed a discrimination complaint with the Equal Employment Opportunity Commission (the "EEOC") and notified UMES of his actions. Coursey's EEOC complaint alleged that UMES had contravened the ADA by "attempting to subject [him] to a fitness for duty exam for the sole purpose of determining whether [he] ha[d] a disability and/or the nature or severity of [his] disability." J.A. 208. Coursey asserted that the Grievance Board's report undercut the University's request for a mental health evaluation and evidenced its inappropriate "ulterior motive." Id.

3.

On May 25, 2010, formal charges of termination were filed against Dr. Coursey on grounds of professional misconduct, incompetence, and insubordination. The following day, President Thompson notified Coursey by letter that he was immediately relieved of all duties and, as of August 1, 2010, would be

7

suspended without pay "until the conclusion of the termination proceedings." J.A. 49. Thompson's letter outlined options for Coursey prior to her decision. Coursey could request a hearing, either "by an impartial hearing officer appointed by [Thompson]" or before a faculty review board, or he could simply resign. Id. In response, on June 22, 2010, Coursey requested a hearing with a faculty review board.

Shortly thereafter, UMES convened a five-member faculty panel (the "Termination Panel") to review the charges lodged against Dr. Coursey and determine whether UMES had cause to terminate him from his position as a full Professor. The Termination Panel met nine times between August 26 and September 28, 2010, heard testimony from nineteen witnesses, and received and considered more than 100 exhibits. Among the exhibits was Coursey's then-pending EEOC complaint, which was introduced into evidence by UMES. Coursey subsequently amended his EEOC complaint to include a retaliation claim, alleging that UMES had illegally initiated the termination proceedings in retaliation for his filing of the EEOC complaint.

Dr. Coursey was represented by counsel before the Termination Panel. Aside from his assertions that UMES lacked cause to terminate him, Coursey contended that the Panel's review should be limited to whether his refusal to submit to the mental health evaluation constituted insubordination. In

8

Coursey's view, the 2009 Grievance Board hearing and the Board's subsequent report had exonerated him of any wrongdoing, and the Termination Panel had no right to consider the prior allegations of misconduct in assessing the issue of termination.[4]

On November 4, 2010, the Termination Panel issued its report to President Thompson, recommending that Dr. Coursey be terminated for incompetence and professional misconduct and concluding that he had "failed to maintain the standards" of the teaching profession. See J.A. 97. The Panel emphasized that Coursey had been "verbally abusive toward students," was disrespectful towards his colleagues and supervisors, and had once approached a female colleague from behind and put his tongue in her ear. Id. The Panel viewed Coursey's continued refusal to submit to a "fitness for duty" evaluation as insubordination and misconduct. Id.

Dr. Coursey appealed the Termination Panel's findings and recommendations to President Thompson. She then heard oral argument from Coursey and representatives of UMES, and determined that Coursey's termination was appropriate. By

---

[4] Dr. Coursey's contention that the Grievance Board's 2009 findings were conclusive on the issue before the Termination Board was rejected in the UMES administrative proceedings and by the district court. We also reject that contention. Coursey has provided no authority for the proposition that the Termination Panel was precluded from entertaining evidence that had been before the Grievance Board.

letter of December 17, 2010, Thompson notified Coursey that he was "hereby terminated from his position," but had the right to appeal to the University System of Maryland's Board of Regents. See J.A. 101. Coursey pursued that appeal, and, on June 17, 2011, the Board of Regents affirmed Thompson's termination decision, concluding that there was "substantial evidence" in support thereof. Id. at 133.[5]

B.

On July 18, 2011, Dr. Coursey initiated this civil action against the defendants in the District of Maryland. On November 29, 2011, he filed an amended complaint (the operative "Complaint" herein). The Complaint first alleges that UMES violated the ADA in requesting that Coursey undergo a mental health evaluation (Count One). The Complaint also asserts that Coursey's termination violated the ADA (Count Two) and the Rehabilitation Act (Count Six), in that Coursey was discharged because he was regarded as disabled. Additionally, the Complaint alleges that Coursey's termination was illegal under

---

[5] Meanwhile, on April 29, 2011, the EEOC dismissed Coursey's EEOC complaint, reciting that it was "unable to conclude that the information obtained establishe[d] violations of the statutes." J.A. 17.

10

the ADA because it was in retaliation for his filing of the EEOC complaint (Count Three).[6]

For reasons explained in its Opinion of April 30, 2013, the district court granted summary judgment to the defendants. The court concluded that UMES's request that Dr. Coursey undergo a mental health evaluation — the basis for his ADA claim in Count One — "was consistent with business necessity," and Coursey "submitted no significant evidence of his own in rebuttal." Opinion 10. In disposing of Coursey's wrongful termination claims under the ADA and the Rehabilitation Act, the court reasoned that, "[b]ecause no reasonable trier of fact could conclude that UMES regarded Dr. Coursey as disabled within the meaning of the ADA, he [could not] establish a prima facie case of wrongful discharge." Id. at 8. Addressing Count Three's ADA retaliation claim, the court determined that Dr. Coursey had failed "to identify a single intervening instance of retaliatory conduct" between his EEOC complaint and his termination "that might suggest a causal link between his complaint and the initiation of termination proceedings." Id. at 11. The court went on to explain that, assuming Coursey had "established a

---

[6] The Complaint also includes a Fourteenth Amendment due process claim under 42 U.S.C. § 1983 (Count Four), and a state law breach of contract claim (Count Five). Dr. Coursey has abandoned both of those claims.

prima facie case of retaliation, UMES had a non-discriminatory" reason for terminating him. Id. The Opinion concluded that because Coursey had failed to show "that UMES's reason for terminating him [was] pretextual, his claim of retaliation [could not] succeed." Id. Coursey has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's award of summary judgment, applying the same legal standards as the district court. See Nader v. Blair, 549 F.3d 953, 958 (4th Cir. 2008). Under those standards, summary judgment may only be awarded when there is no genuine dispute of material fact. Id. As we have explained, "courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue"; however, "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996). If, after considering the record as a whole, we determine "that a reasonable jury could return a verdict for [the plaintiff], then a genuine factual dispute exists and summary judgment is improper." Id. at 959.

12

A.

Count One of the Complaint alleges that UMES contravened § 102 of the ADA (codified at 42 U.S.C. § 12112), by requesting that Dr. Coursey undergo a mental health evaluation that "was neither job-related nor consistent with a business necessity." J.A. 11. Section 102 prohibits an employer "from requiring a medical examination or making inquiries of an employee as to whether he is an 'individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity.'" Porter v. U.S. Alumoweld Co., 125 F.3d 243, 246 (4th Cir. 1997) (quoting 42 U.S.C. § 12112(d)(4)). Nevertheless, the relevant EEOC regulations authorize an employer "'to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job.'" Id. (quoting 29 C.F.R. pt. 1630, App. § 1630.14(c)). Whether a required mental health evaluation is "job-related and consistent with business necessity" is assessed under an objective standard. See Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 518 (3d Cir. 2001). A business necessity must be based on more than "mere expediency," and will be found to exist where the employer can "identify legitimate, non-discriminatory reasons to doubt the employee's capacity to

13

perform his or her duties." See Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 97, 98 (2d Cir. 2003); see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

Dr. Coursey's position as a full Professor at UMES required that he instruct, supervise, and interact with students and faculty in a professional and non-threatening manner. Given the plethora of complaints about Coursey's violent outbursts, erratic and inappropriate behavior, as well as his disregard for UMES policies, UMES has shown that it had valid concerns about Coursey's ability to perform his duties. A university is in the business of educating students; as such, it is essential that its faculty members be able to fulfill that role.

Dr. Coursey counters that because the Grievance Board recommended his reinstatement and President Thompson falsely believed that the Board had recommended the mental health evaluation, "any allegations regarding Dr. Coursey's conduct are merely afterthoughts." Br. of Appellant 16. Thus, Coursey contends, the President's request that he undergo an evaluation was improper, in that it was not based on "evidence obtained, or available to the employer, prior to making a disability related inquiry." Id. Coursey's contention in this regard ignores the evidence supporting the directive that Coursey submit to a mental health evaluation, including student complaints and Dean Blanchard's independent report, which made an explicit

14

recommendation that Coursey be so evaluated. Moreover, Coursey's argument mischaracterizes the role of the Grievance Board in 2009. Thompson possessed the ultimate authority to lift Coursey's suspension, see J.A. 153, and she was acting within her discretion in seeking more information before doing so. That she erred in relying on the Board's report for support of her request for the mental health evaluation does not mean that her actions ran afoul of the ADA. Coursey has not forecast any evidence creating a genuine issue of material fact on that point, and the district court properly granted summary judgment against him on Count One.

B.

Counts Two and Six of the Complaint allege that Coursey was wrongfully discharged, in contravention of the ADA and the Rehabilitation Act.[7] As we have explained, "[t]o the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements." Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012). Although the two statutes employ differing terminology, they have generally been read to "require a plaintiff to demonstrate the same elements to

---

[7] Although Count Two alleges ADA violations under § 102 (42 U.S.C. § 12112), Count Six does not identify any particular provision of the Rehabilitation Act. Like the district court, we read Count Six to allege a violation of § 504 of the Rehabilitation Act (codified at 29 U.S.C. § 794).

15

establish liability."  Id.  Thus, to make a prima facie case for a wrongful discharge, the plaintiff must show that:

> (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). A crucial distinction between the ADA and the Rehabilitation Act is found in the third element of a wrongful discharge claim, that is, causation.  Halpern, 669 F.3d at 461.  Under the Rehabilitation Act, a plaintiff must show that he was subject to employment discrimination "solely by reason of her or his disability."  29 U.S.C. § 794(a).  In contrast, the ADA prohibits discrimination against a "qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Although the causation requirements of the statutes are slightly different, that distinction does not bear on our analysis of the summary judgment award on Counts Two and Six.  Because Coursey has failed to establish the first common element of those wrongful discharge claims — membership in a protected class — we need not reach the issue of causation on either Count Two or Count Six.

Under the framework outlined above, to establish membership in an ADA protected class, a plaintiff must show that he is "a

16

qualified individual with a disability." Haulbrook, 252 F.3d at 702. The ADA defines a disability as "a physical or mental impairment" that "substantially limits one or more of the major life activities of an individual," and that includes a record of such an impairment or "being regarded as having such an impairment." Id. at 702-03. In pursuing his wrongful discharge claims, Dr. Coursey does not maintain that he actually has a disability; rather, he maintains that UMES must have regarded him as disabled because President Thompson requested that he undergo a mental health evaluation. To establish that he was regarded as disabled, Coursey must show that: (1) UMES mistakenly believed that he had a physical or mental impairment that substantially limited one or more major life activities, or (2) UMES mistakenly believed that an actual, nonlimiting impairment substantially limited him in one or more major life activities. See Rhoads v. FDIC, 257 F.3d 373, 390 (4th Cir. 2001).

We have not decided whether an employer's request for an evaluation of its employee is, in and of itself, sufficient to show that the employer regarded the employee as disabled for purposes of the ADA. Of the courts of appeals to address this issue, however, all have concluded that it is not. See Tice, 247 F.3d at 508-9 ("[A]n employer's request for a medical examination, standing alone, is not sufficient to establish that

17

the employer regarded the employee as disabled, and thus cannot itself form the basis for establishing membership in the protected class under the ADA."); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811 (6th Cir. 1999) (same); Colwell v. Suffolk Cnty. Police Dep't, 158 F.3d 635, 647 (2d Cir. 1998) (same). As the Third Circuit explained in Tice, an ADA plaintiff must point to other evidence showing that his employer regarded him as disabled — that is, substantially limited in a major life activity — and not just that it harbored concerns about his ability to perform his job. See 247 F.3d at 513; see also Taylor v. Fed. Express Corp., 429 F.3d 461, 464 (4th Cir. 2005) (explaining that "major life activity of working" is not limited to one position or type thereof). This record does not reveal that UMES regarded Dr. Coursey as disabled, nor has Coursey pointed to evidence suggesting that there is a genuine issue of material fact on that issue. We are therefore satisfied to affirm the award of summary judgment to the defendants on Counts Two and Six.

C.

In Count Three of the Complaint, Dr. Coursey alleges that he was terminated in retaliation for his EEOC complaint against UMES, in violation of § 503 of the ADA (codified at 42 U.S.C. § 12203). Section 503 prohibits discrimination against any individual "because such individual made a charge, testified,

18

assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To make a prima facie case of retaliatory discharge, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer acted adversely against him; and (3) the protected activity was causally connected to the employer's adverse action. See Rhoads, 257 F.3d at 392. When those elements are satisfied, the burden shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." Id. If the employer satisfies that burden, "the plaintiff 'must demonstrate that the proffered reason is a pretext for forbidden retaliation.'" Id. (quoting Haulbrook, 252 F.3d at 706).

The district court granted summary judgment against Dr. Coursey on Count Three, determining that he had failed to make a prima facie showing of retaliatory discharge and that, in any event, UMES had established that it possessed a non-discriminatory, non-pretextual reason for terminating him. Contrary to the district court, we are satisfied that Coursey made a prima facie case. We nevertheless affirm the judgment because we agree with the court's alternative ruling that UMES had solid non-discriminatory and non-pretextual reasons for terminating Coursey.

19

As for the prima facie showing, Dr. Coursey's filing of his EEOC complaint in October 2009, and his subsequent termination by UMES in 2010, suffice to satisfy the first two elements. Our remaining inquiry is whether Coursey has shown a causal relationship between the two events — that is, did his termination by UMES result from his earlier EEOC filing? We are satisfied that Coursey has established the element of causation and thus met his initial burden on the retaliatory discharge claim.

We have recognized that the discharge of an employee soon after he engages in a protected activity is "strongly suggestive of retaliatory motive," Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994), and "gives rise to a sufficient inference of causation to satisfy the prima facie requirement," King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003). There is no precise formula as to when an employer's actions will trigger application of that inference. In the context of this case, however, the seven-month period between Dr. Coursey's 2009 EEOC complaint and UMES's initiation of termination proceedings against him in May of 2010 supports an inference of retaliatory motive. Moreover, that UMES actually introduced the EEOC complaint into evidence before the Termination Panel is highly suggestive of a causal link. See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) (concluding that employer's

20

knowledge of discrimination charge shortly before employee's termination "certainly satisfies the less onerous burden of making a prima facie case of causality"); see also Shirley v. Chrysler First, Inc., 970 F.2d 39, 43-44 (5th Cir. 1992) (deeming supervisor's repeated mention of employee's EEOC complaint sufficient to establish causation). UMES's decision to present Coursey's EEOC complaint as evidence in his termination proceedings was undeniably flawed, and we are unwilling to condone such a practice. To the contrary, UMES and other employers should know that the filing of an EEOC complaint is a protected activity and must be zealously secured "to ensure employees' continuing access to the EEOC and the enforcement process." See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998).

Because Dr. Coursey has made a prima facie showing of retaliatory discharge, we must decide whether UMES has demonstrated that it had a legitimate and non-retaliatory reason for terminating him. If so, we assess whether Coursey can successfully rebut that legitimate and non-retaliatory reason by showing it to be pretextual. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998).

The record is replete with evidence supporting UMES's justification for terminating Dr. Coursey, including complaints from multiple faculty members and students about Coursey's

21

conduct, documented violations of UMES policies, and Coursey's refusal to submit to the mental health evaluation. As such, UMES has satisfied its burden of showing a legitimate and non-retaliatory reason for Coursey's termination.

Dr. Coursey counters by pointing to the discrepancy between the findings of the Grievance Board and the report of the Termination Panel. Coursey contends that, because "the evidence presented to the Boards was substantially similar, at the very least, a factual dispute exists as to whether [UMES] had grounds to terminate [him]." Br. of Appellant 22. Coursey also reiterates that UMES placed his EEOC complaint into evidence before the Termination Board and emphasizes that he remained suspended from the UMES campus for the seven months between the filing of his EEOC complaint and his termination.

Dr. Coursey's rebuttal contentions fail for multiple reasons. First, the two faculty panels — the Grievance Board in 2009 and the Termination Panel in 2010 — were tasked with resolving different issues. The Grievance Board evaluated the propriety of suspending Coursey, based largely on relevant UMES procedures, while the Termination Panel determined whether UMES had cause to terminate him. Second, even viewing the record in the light most favorable to Coursey, UMES possessed substantial evidence of his misconduct over an extended period of time. Such evidence provided a proper basis for President Thompson's

22

ultimate decision to terminate Coursey. Third, Coursey has not pointed to any evidence suggesting that the Termination Panel, President Thompson, or the Board of Regents used his EEOC complaint against him. Finally, the record indicates that UMES had already taken action — albeit not rising to the level of termination — to address Coursey's misconduct before he filed his EEOC complaint in 2009. Simply put, UMES has satisfied its burden and Coursey has failed to establish the existence of any genuine issue of material fact as to pretext. We therefore affirm the award of summary judgment to the defendants on Count Three.

## III.

Pursuant to the foregoing, we affirm the judgment of the district court.

<u>AFFIRMED</u>

23