James L. **THOMPSON** and Victoria E. Thompson, husband and wife, Pennsylvania residents, Plaintiffs,

v.

**AT&T CORPORATION**, a New York Corporation, t/d/b/a AT&T Media Services, t/d/b/a TCI of Pennsylvania, and t/d/b/a AT&T Broadband, Defendant.

Civil Action No. 01–229J.

United States District Court, W.D. Pennsylvania.

March 17, 2005.

Mark J. Bushnell, Bushnell Law Firm, Pittsburgh, PA, Mark J. Bushnell, for Plaintiff.

Terrence H. Murphy, Bobbi N. Britton, Klett, Rooney, Lieber & Schorling, Pittsburgh, PA, Lisa G. Silverman, Maureen P. Kelly, Babst, Calland, Clements & Zomnir, for Defendant.

## MEMORANDUM OPINION and ORDER OF COURT

GIBSON, District Judge.

This matter comes before the Court on the Defendant's Motion for Summary Judgment (Document No. 43) and accompanying Brief (Document No. 44) and the Plaintiffs' Response in Opposition to Summary Judgment (Document No. 49). The parties have filed proposed statements of undisputed facts (Document No. 45) and a response thereto (Document No. 51), along with accompanying appendices (Document Nos. 46, 51–53) in accordance with Local Rule 56.1. The Defendant subsequently filed a reply (Document No. 56) and the Plaintiffs filed a sur-reply (Document No. 58). The Court has jurisdiction over the Americans with Disabilities Act (ADA) claims pursuant to 28 U.S.C. § § 1331, 1343 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The Court grants the motion in part and denies the motion in part.

The following factual history is based upon the undisputed facts of record submitted by the parties based upon the foregoing documents.

## UNDISPUTED FACTUAL HISTORY [1]

In early January 1996, Cable AdNet hired Plaintiff, James L. Thompson (Plaintiff). Defendant's Fact No. 1. Cable AdNet was a subsidiary of TCI of Pennsylvania (TCI) both prior to and after Plaintiff's hire. Plaintiffs' Fact No. 2. On March 9, 1999, AT & T Corporation and/or its subsidiary, AT & T Broadband, (both AT & T) [2] acquired TCI. Defendant's Fact No. 3. Plaintiff first reported to Altoona Local Sales Manager Dale Manning (Manning) until June 1996, and then reported to Technical Operations Manager Eric Grumling (Grumling) from that time until August 1996; from August 1996 until March 1999, Plaintiff reported to Production Manager Joel Watkins (Watkins) who in turn, reported to Grumling. Defendant's Fact No. 4; Plaintiffs' Fact No. 4.

On Sunday, February 4, 1996, Plaintiff underwent emergency surgery for an aor-

---

1. All facts will be cited to as a "Defendant Fact No. ——" or "Plaintiff Fact No. ——" with all citations to the record omitted. Although most of the recited undisputed facts in this opinion are direct quotes from the Plaintiffs' and Defendant's submissions, all quotation marks, except those used by the parties, are omitted to facilitate the ease of reading the facts. Should the Court find an undisputed fact from the citations referenced that does not correspond to that fact proposed by either of the parties, it will be labeled "Undisputed Fact(s) of Record". If proposed facts or portions thereof are omitted, it is because the Court has concluded that such facts are in dispute and/or immaterial. For those proposed facts that were not responded to by opposing counsel, such facts are accepted as undisputed in accordance with Local Rule 56.1(E) and labeled "unanswered." The facts which are presented may appear disjunctive as certain other facts that are in dispute among the parties are not presented here.

2. AT & T Media Services will also be referred to as "AT & T".

tic aneurysm; on March 4, 1996, Plaintiff came back to work on a limited basis, approved by Defendant, until April 1, 1996, when he resumed a full-time schedule; during this time he reported to Manning who forced the Plaintiff to clean out a storage closet in front of the salespeople while Manning referred to the closet as "the old man's new office." Plaintiffs' Fact Nos. 5, 75; Undisputed Facts of Record. Starting in August 1996 through March 1999, Plaintiff reported to Watkins, who was hired as the Production Manager; in March 1999, Plaintiff was ordered to report to Manning. Defendant's Fact No. 6; Plaintiffs' Fact No. 6. Manning and Grumling reported to Cross until February 1999, when Grumling transferred to another division of Defendant; Watkins had reported to Grumling from August 1996 until February 1999. After Grumling's departure, Watkins reported to Cross; on March 12, 1999, Cross ordered Plaintiff to formally report to Manning. Plaintiffs' Fact No. 7.

The Production Department in which Plaintiff worked supported the Sales Department by producing the commercial advertisements sold to clients. Defendant's Fact No. 8. When Plaintiff was Creative Director from January 1996 through June 1996, he met with clients, marketed the concept of doing a commercial to the client, hired a production crew, and had the commercial shot; in or around June 1996, Plaintiff's title was changed to Production Specialist and his duties changed to actually shooting the commercials and writing scripts; this demotion was ordered by Manning but it did not result in a decrease in pay; in June of 1998, Cross told the Plaintiff that he was being promoted to Senior Production Specialist, but his duties and compensation remained the same; from May 1999 to July 1999, Plaintiff's title was changed to Production Coordinator, where his duties entailed being solely a cameraman and shooting commer-

cials. Plaintiffs' Fact Nos. 9, 14; Defendant's Fact Nos. 10,14; Undisputed Facts of Record.

Plaintiff's 1997 performance appraisal, dated December 22, 1997, and his 1998 performance appraisal, dated December 18, 1998, both completed by Watkins, indicate that Plaintiff's job performance generally was satisfactory and above, except in the areas of communications and working relationship with the Sales Department staff; Plaintiff was fearful that if he refused to sign the appraisals, there would be retaliation resulting in the loss of his job. Defendant's Fact No. 13; Plaintiffs' Fact No. 13. From January 2, 1996 through July 23, 1999, Plaintiff received wage increases each year of about 4%, which Plaintiff was told was the highest permissible in the company. Defendant's Fact No. 15; Plaintiffs' Fact No. 15. In 1997, the compensation paid to Cross was changed from a salary to a commission basis. Plaintiffs' Fact No. 91 (unanswered).

In a February 5, 1999 letter to Cross, Plaintiff complained of harassment, discrimination and retaliatory conduct by Manning. Plaintiff's complaint had been addressed through a corrective discipline memorandum, however, Plaintiff did not have knowledge of such action when it took place. Defendant's Fact No. 16; Plaintiffs' Fact No. 16; Undisputed Fact of Record. According to Plaintiff, the alleged harassment was due to Plaintiff's "age" and "medical condition"; by "medical condition," Plaintiff was referring to surgery he had in 1996, shortly after he began working at Cable AdNet; Plaintiff also provided specific instances of harassment, and discriminatory and retaliatory conduct by Manning in his letter of February 5, 1999. Defendant's Fact No. 17; Plaintiffs' Fact No. 17. Cross determined that Manning had directed profanity at

Plaintiff during the December 1998 telephone conference among Watkins, Plaintiff and Manning; Cross issued Manning a written warning. Defendant's Fact Nos. 19, 20.

On April 5, 1999, Plaintiff wrote to Cross, accusing Cross, *inter alia,* of blaming him for his poor working relationship with Manning, failing to address the "issue of his disability" and not addressing the complaints raised in his February 5, 1999 letter; in the April 5, 1999 letter to Cross Plaintiff also informed Cross that he was following Cross's orders by moving to the Altoona office and reporting to Manning despite the "direct and immediate threat to his mental health"; Plaintiff also expressed concern that Cross retaliated on account of Plaintiff requesting accommodations and contact with Magill by forcing him to work at the Altoona office and report to Manning; also Plaintiff related his disappointment that Cross issued two follow-up memoranda appearing to focus blame on him for Manning's conduct; as well, Plaintiff confronted Cross's position that Plaintiff had to be available to meet with clients, yet under Cross's own directive of "seamless service" to clients all communications were to go through Watkins. Defendant's Fact No. 21; Plaintiff's Fact No. 21. "One point of contact policy" expressly required "seamless service" with all production contact being funneled through to Watkins; further, the job description for Production Coordinator, Plaintiff's job at the time he was constructively discharged, required only that he be able to carry camera equipment and film commercials at the client site along with related duties. Plaintiffs' Responsive Fact No. 26; Undisputed Fact of Record.

On April 8, 1999, Cross met with Plaintiff to address the issues raised in Plaintiff's April 5 letter. During the meeting, Plaintiff asked for an accommodation; Cross asked Plaintiff to have his treating physician provide information regarding his medical condition; Plaintiff had previously asked Magill for accommodations on March 8, 1999; Cross ordered Plaintiff to continue reporting to Manning. Defendant's Fact No. 22; Plaintiffs' Fact No. 22.

On April 14, 1999, Plaintiff wrote to his treating psychiatrist, Joseph S. Silverman, M.D. (Dr. Silverman), asking that Dr. Silverman send a letter to AT & T, explaining that Plaintiff had a history of depression and recommending "accommodations." Plaintiff also said in the letter that his "disability does not affect [his] ability to perform [the] 'essential' job functions as outlined in [his] job description and as expected by [his] immediate supervisor." Plaintiff also specifically stated, "I'll leave the diagnosis and recommendations to you" as Plaintiff is not a physician; additionally, Plaintiff prefaced his discussion of his understanding of the Americans with Disabilities Act (Act) with the phrase "From a layman's perspective ..." because he obviously did not know how "essential" job functions are defined under the Act. Plaintiff spoke to the accommodations needed to perform his essential job functions and stated that he would not be able to perform his essential job functions without accommodations. Defendant's Fact No. 23; Plaintiffs' Fact No. 23. Plaintiff continued to perform his job duties from April 14 until July 23, 1999. Defendant's Fact No. 24.

In an April 20, 1999 letter to AT & T, Dr. Silverman said Plaintiff was a "high-functioning person capable of sophisticated work in a number of areas," but that his depression symptoms had been exacerbated since February 1999, and "[t]his disorder in the past induced periods of disability. Rehabilitation efforts have been necessary. Potential exists for disabling illness in the future...." Dr. Silverman

did not assert in the letter that Plaintiff was substantially limited in any major life activity. The letter listed several "minor" accommodations suggested by Plaintiff that could "contribute to the effort for recovery," which were allowing Plaintiff "to do his work from home at times," reassignment to another position, "introducing flexibility into his work schedule," "and/or" providing Plaintiff "a work area relatively free of noise and distraction." Defendant's Fact No. 25; Plaintiffs' Fact No. 25.

Cross, Magill and Watkins evaluated Plaintiff's accommodation suggestions and Dr. Silverman's letter. Defendants' Fact No. 26. No one contacted Dr. Silverman for further discussion regarding Plaintiff's disability or necessary accommodations. Plaintiffs' Responsive Fact No. 26. After discussions among Cross, Watkins and Magill, it was determined that, based on Plaintiff's job requirements and business needs, he could work at home six to eight hours per week. Defendant's Fact No. 28. Plaintiff lived in Altoona and was only five minutes away from the Altoona office even when he was working at home. Plaintiff had a home telephone, cellular telephone, fax, pager, and e-mail, and thus was easily accessible. Plaintiffs' Fact No. 118 (unanswered). Manning, Grumling, and Watkins admitted that Plaintiff could work out of his home so long as he was accessible to the salespeople. Plaintiffs' Fact No. 86 (unanswered). Cross told Plaintiff that his working out of the home would not cause hardships to Defendant. Dr. Silverman testified that the stated accommodation of 6 to 8 hours a week at home was trivial and that no one from Defendant had contacted him regarding the accommodations requested. Plaintiffs' Fact No. 89 (unanswered). This arrangement was communicated to Plaintiff in a May 7, 1999 memorandum from Cross and a May 11, 1999 telephone conference with Cross and Magill. Defendant's Fact No. 29. Cross and Magill communicated to Plaintiff that his weekly work schedule would be based on meetings and the production schedule directed by Watkins. They also explained to Plaintiff that, after a 90–day trial period, the arrangement would be reevaluated to ensure it was working. Defendant's Fact No. 30. The reason [Cross] provided to Plaintiff for not permitting him to work out of the home was "what will I tell Barbara Darlington [a salesperson] if you are allowed to work out of the house." Plaintiffs' Fact No. 87 (unanswered). Defendant dictated "accommodations" it would provide to Plaintiff and did not engage in an interactive process. Plaintiffs' Fact No. 88 (unanswered).

Neither Cross, Watkins nor Magill were familiar with Plaintiff's personal life and had no knowledge whether or how his depression affected other aspects of his life. Defendant's Fact No. 32. Cross, Manning, Grumling, and Watkins accused Plaintiff of preposterous instances of misconduct while in full knowledge that such instances were false and these actions were done in order to humiliate and cause emotional distress to Plaintiff. Plaintiffs' Fact No. 78 (unanswered). In May 1999, at the time Defendant granted Plaintiff what it considered accommodations, it hired Robert Paterson, who was not disabled, as a Production Coordinator to replace Plaintiff in the position. In June 1999, Patterson told Plaintiff that Watkins had told him that Plaintiff would be leaving Defendant's employ soon and that he, Patterson, would be taking his place. Plaintiffs' Fact No. 94 (unanswered).

In or around June 1999, AT & T instituted a compensation program, called "Power Pay." One part of the Power Pay program was the conversion of TCI job titles to AT & T Power Pay program job titles. TCI jobs were given the title of the

AT & T job whose duties and responsibilities most closely reflected the former TCI job; however, Plaintiff's TCI job title of Senior Production Specialist, the title he was removed from by May 1999, with its associated duties, existed at AT & T. Defendant's Fact No. 34; Plaintiffs' Fact No. 34. The Power Pay job title conversion process was implemented throughout the organization and the job titles of several employees were changed. Defendant's Fact No. 36. Plaintiff states that the goals and objectives were presented to him as a final warning and in the nature of goals to keep his job. Plaintiff testified, however, that Watkins told him that they were based on Watkins' "sincere desire . . . that [he] improve upon these things to save [his] job." Defendant's Fact No. 41. Apart from learning in April 1999 that Plaintiff suffered from depression, Watkins had no knowledge that Plaintiff's depression affected his work or any other aspect of his life. Defendant's Fact No. 42.

On July 24, 1999, Plaintiff alleges that he suffered a "complete emotional and mental breakdown" and has since been unable to work. Defendant's Fact No. 43. Plaintiff claims Manning was the primary source of his stress. Defendant's Fact No. 44. Plaintiff admits that from January 2, 1996, through July 23, 1999, Plaintiff performed his job duties as required by his employer. Defendant's Fact No. 45.

In early August 1999, Plaintiff completed paperwork, requesting a leave of absence under AT & T's Family and Medical Leave Act (FMLA) policy. Defendant's Fact No. 46. Plaintiff was approved for an FMLA leave, commencing on August 9, 1999, then commencement was subsequently backdated to July 24, 1999. Defendant's Fact No. 47; Plaintiffs' Fact No. 47. Plaintiff took approved sick and vacation leave from July 25, 1999 through August 7, 1999. FMLA leave had been ap-proved by Cross to commence on August 9, 1999, but he subsequently backdated it to July 24, 1999; the FMLA leave began on July 24 because Plaintiff's last day worked was July 23, 1999. Plaintiffs' Fact No. 48; Undisputed Fact of Record; Defendant's Fact No. 48. AT & T provided Plaintiff sixteen weeks of FMLA leave, which expired on November 26, 1999. Defendant's Fact No. 49. Because Plaintiff could not return to work after the expiration of his FMLA leave, AT & T provided Plaintiff a 30–day personal leave of absence while he applied for disability leave under AT & T's Short–Term Disability Leave Policy. Defendant's Fact No. 50.

Plaintiff applied to Cigna for short-term disability leave benefits in or around September or October 1999, and Cigna approved the benefits in or around February 2000. Defendant's Fact No. 51; Undisputed Fact of Record. Magill intentionally and falsely reported to the disability insurance carrier that Plaintiff had not enrolled in Defendant's disability program. Plaintiffs' Fact No. 95 (unanswered). In February 2000, Plaintiff applied for Social Security Disability Insurance (SSDI) benefits, which were later awarded. In a May 10, 2000 letter to Dr. Silverman regarding occupational prospects, Plaintiff stated, "I am not able to work in any capacity and I do not have the ability to search for employment elsewhere." Defendant's Fact No. 53. In discovery, Plaintiff admitted that since July 24, 1999, he has been disabled from or unable to perform his last job at AT & T or any substantially equivalent jobs. Defendant's Fact No. 54. The Social Security Administration Disability Report Adult Form which Plaintiff completed posed the question: "how do your illness, injuries or conditions limit your ability to work?" Plaintiff responded: "Depressive episode, I am unable to perform in any capacity due to the limitation imposed by

this condition." Defendant's Fact No. 55. In October 2000, Plaintiff was granted SSDI benefits based in part on his being unable to perform the requirements of his past relevant work. Defendant's Fact No. 56. Since July 24, 1999, Plaintiff has been disabled from working at his last AT & T job and substantially equivalent work, and has been unable to look for work. Defendant's Fact No. 58.

Plaintiff's medical records related to treatment by Dr. Silverman show that his depression was in remission from at least 1991 through February 2, 1999, coinciding with the first nervous breakdown. Additionally, the frequency of Plaintiff's visits to Dr. Silverman increased dramatically from February 2, 1999 onward, and Plaintiff's Zung tests, which diagnose depressive symptoms, administered by Dr. Silverman, likewise show a dramatic increase from 32 (low level depression) in 1991 to 52 (pathological) by August 6, 1999, immediately after the constructive discharge, coinciding with the second nervous breakdown, and finally to 62 (highly pathological) on November 15, 1999, the time period when AT & T was pressuring him to resign. Plaintiffs' Fact No. 90 (unanswered).

In Cross's Manager Performance Review, Plaintiff was rated unacceptable in the area of "Achievement of Sales and Financial Goals", in that he was 14% below budget in terms of revenue generated and 37% below budget in terms of cash flow generated. Plaintiffs' Fact No. 92 (unanswered). Cross received a letter from the Executive Vice–President of Marketing for Defendant, congratulating his sales team on increasing their revenue. Cross later boasted in his resume that he increased cash flow by 74% from 1996–97 and revenue by 40% from 1996–97. Plaintiffs' Fact No. 93 (unanswered).

Grumling and Watkins stated that "there was a lot of contention" as to whether Manning or Cross was really in charge. Plaintiffs' Fact No. 97 (unanswered).

Plaintiff was supposed to drive to Barnesboro, Pennsylvania to shoot a client commercial, but drove to Johnstown instead, and had to turn around and drive back due to his concentration being so impaired. Plaintiff was "an accident waiting to happen" in that he believed he was a danger to other people and himself in that he had no cognizance of what he was doing as a result of his memory and concentration impairment. Plaintiff was having difficulties with grooming, sleeping, eating, and relations with his wife due to his concentration and memory impairment. Plaintiff was unaware that he was at the client's location shooting commercials due to his concentration and memory impairment. Plaintiffs' Fact Nos. 98, 100, 101, 102, 103. (unanswered).

The Plaintiffs claim damages for loss of back pay and front pay of up to $2,054,264.00, in that Plaintiff is completely disabled, and loss of consortium. Plaintiffs' Fact No. 99.

While Plaintiff's depression was in remission, he functioned well and was able to work the whole time. Plaintiffs' Fact No. 96 (unanswered). Plaintiff's visits to Dr. Silverman increased dramatically, due to the February 2, 1999 nervous breakdown and exacerbation of the depression. Plaintiffs' Fact No. 105 (unanswered). Plaintiff's concentration was so impaired that he had to have a quiet environment with no interruptions in order to do his script writing, even if the script was as short as 75 words. Plaintiffs' Fact No. 106 (unanswered). Plaintiff would try for hours to put a hose on a dishwasher and could not remember how to operate the screwdriver. Plaintiffs' Fact No. 108 (unanswered). Plaintiff taped a wedding for eight hours and did not remember it due to the impair-

ment to his concentration and memory. Plaintiffs' Fact No. 109 (unanswered). Plaintiff suffered hallucinations due to the exacerbation of the depression. Plaintiffs' Fact No. 110 (unanswered).

From February 2, 1999 through July 23, 1999, Plaintiff was capable of doing the other aspects of the job, such as the actual filming of the commercial, driving to client locations, meeting salespeople or keeping appointments with them, had Defendant provided him with the accommodations of doing his script writing and administrative work in a quiet place. Plaintiffs' Fact No. 111. Plaintiff did not request, as an accommodation, that he be kept away from Manning, only that Defendant take appropriate steps to stop Manning's egregious conduct. Plaintiffs' Fact No. 112 (unanswered). Manning admitted that it would not have been necessary for Plaintiff to interact with him, given their respective job duties. Plaintiffs' Fact No. 113 (unanswered). Plaintiff tried to contact Magill on March 11, 1999 to discuss his disability and accommodations but she did not return his call. Plaintiffs' Fact No. 114 (unanswered). Magill expressed her astonishment that Cross did not respond to the serious allegations Plaintiff had raised in his February 5, 1999 letter when Plaintiff phoned her on March 8, 1999. Plaintiffs' Fact No. 115 (unanswered).

Plaintiff had written letters to Cross on August 18, September 16, October 18, and November 12, 1999 expressing his hope that he would be returning to work, requesting reasonable accommodations, and advising that he was treating with Dr. Silverman and undergoing rehabilitation through the Office of Vocational Rehabilitation (OVR). Plaintiffs' Fact No. 116 (unanswered). Coinciding with Defendant pressuring Plaintiff to resign, Plaintiff's Zung score, the test Dr. Silverman employs to assess depressive conditions, had risen to 62 on November 15, 1999, which is highly pathological, as the norm is in the 20's. Plaintiffs' Fact No. 117 (unanswered).

## ANALYSIS

■ The Plaintiffs are proceeding upon five remaining counts after the partial granting of the Defendant's Motion to Dismiss on September 10, 2002. The remaining counts are alleged violations of the Americans with Disabilities Act (ADA) (Count I), and of the Pennsylvania Human Relations Act (PHRA) (Count II), intentional infliction of emotional distress (Count III) and the two derivative damage claims of loss of consortium(Count IX) and punitive damages (Count X). The Court will first analyze the Motion as to Counts I and II; such overlapping analysis is permitted as the PHRA and the ADA are similarly construed by federal courts. *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3rd Cir.1999)(citing *Kelly v. Drexel University*, 94 F.3d 102, 105 (3rd Cir.1996)).

### I. *ADA and PHRA Claims*

The ADA prohibits any discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines the term "qualified person with a disability" as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to

the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12112(8). 42 U.S.C. § 12102(2) sets forth three possible definitions of disability for purposes of the ADA: "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Finally, three elements are needed to establish a *prima facie* claim under the ADA: " '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.' " *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3rd Cir.1999) (citations omitted).

The Defendant begins its argument for summary judgment on the ADA and the PHRA with challenges to the Plaintiff's qualifications under each of the three alternative definitions of disability quoted above. The Defendant does not contest the existence of an impairment for the purposes of its summary judgment motion. Defendant's Brief, p. 3.

*" . . . substantially limits . . . "*

■ The definition of "Substantially limits" is as follows:

(j) Substantially limits—

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

(3) With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an

impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 CFR § 1630.2(j). This regulation along with other EEOC interpretive guidelines are to be given much deference in this Circuit. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933 (3rd Cir. 1997).

Defendant, citing to evidence in the record, argues that as to 42 U.S.C. § 12102(2)(A) that the Plaintiff was able to participate in the major life activity of "working" contrary to the allegations in the Plaintiffs' Complaint. Defendant's evidence points to the fact that the Plaintiff continued to work from his hire date until July 23, 1999, the day before his second nervous breakdown, that in a letter to his psychiatrist Plaintiff stated that he could still perform "essential" functions of his employment (*see* p. 5, *supra)*, and that the Plaintiff does not have evidence that he was unable to perform "a broad range of jobs in various classes." Defendant's Brief, pp. 4–5.

The Plaintiff argues that he is substantially limited in the major life activities of thinking and working; he relies upon the case of *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783 (3rd Cir.1998) for the proposition that EEOC's interpretive

guidelines require a two-step analysis to determine if one is substantially limited. Plaintiffs' Brief, p. 18.

Defendant counter-argues that Plaintiff performed various job duties that belie the argument that he was impaired as to his ability to think and concentrate.

 The interpretive guidelines promulgated by the EEOC establish a two-step analysis for determining if an individual is substantially limited in a major life activity. First, the Court must ascertain if the individual is substantially limited in a major life activity other than "working" by comparing the individual's abilities while impaired to those of the "average person in the general population." *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783 (3rd Cir.1998) (citations omitted). If the individual is substantially limited in any of those major life activities other than work, the individual qualifies as "disabled" and the inquiry ceases. *Id.* at 784. If no substantial limitation is found, then the inquiry proceeds to determine if the individual has a substantial limitation in the major life activity of working by inquiring if the individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes *as compared to the average person having comparable training, skills and abilities.*" *Id.* at 784 (emphasis in the original).

 A review of the undisputed facts being used for the purpose of this summary judgment motion demonstrates that even such undisputed facts are in conflict as to the ability and functioning of the Plaintiff to engage in the major life activity of "thinking." It is noted that the Plaintiff had various job duties that were changed at various times, which included marketing ideas to clients, script writing, and fulfilling the duties of a cameraman from Janu-

ary 1996 until July 1999. Further the Plaintiff himself admitted to his doctor that his "disability" did not interfere with his "essential" job functions, that he "performed his job duties as required by his employer," and that he was "well functioning" from the beginning of his employment until February 1999. Still other undisputed facts demonstrate that the Plaintiff's doctor requested accommodations for the Plaintiff in the form of changes to his work schedule, working at home and making his work area "free of noise and distraction." Plaintiff further indicated that he needed a "quiet environment" to write scripts as short as "75 words." With these contradictions among even the undisputed facts of record, the Court finds that whether the Plaintiff was substantially limited in the major life activity of thinking remains a disputed issue of material fact which is an issue for a jury. Although for purposes of the summary judgment motion our inquiry could end here on this issue, whether Plaintiff qualifies as disabled under the ADA, our inquiry will now proceed to the issue of substantial limitation of the major life activity of working in that this was the issue raised by the Defendant.[3]

■ In determining if the Plaintiff is substantially limited in the major life activity of working, the Court must consider the Plaintiff's "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3);

see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Determining whether a person is disabled under the ADA requires an "individualized inquiry." Sutton at 483, 119 S.Ct. 2139. Among the considerations for determining a limitation on the ability to work are the nature, severity, duration and permanency or long term impact of the impairment; the geographical area accessible to the Plaintiff; and the job from which the Plaintiff was disqualified along with the number and types of jobs from which the Plaintiff has been disqualified due to his impairment that do or do not require the same skills, abilities and knowledge and training that are located in the same geographical area. See 29 CFR § 1630.2(j), supra.

The Defendant argues that prior to July 24, 1999 Plaintiff was not disabled as he was not substantially limited in the major life activity of working. The Plaintiff counter-argues that he was qualified to work in a broad class of jobs prior to the harassment engaged in by the Defendant and that since the Defendant's actions, the Plaintiff's "inability to concentrate or think unless he is in an environment free of interruptions would make him unable to perform" in that broad class of jobs. Plaintiffs' Brief at p. 24. Plaintiff concludes his argument by stating that "it is submitted he is substantially limited in the major life activity of working because Plaintiff's limited ability to concentrate

---

3. The Plaintiff fails to allege any limitations to his major life activity of "thinking" within the Complaint and thus the Defendant only challenged Plaintiff's status as disabled under the ADA with regard to the major life activity of "working" as alleged in its Motion for Summary Judgment. Therefore, it appears to the Court that the Plaintiff interjected the issue of substantial limitation in his life activity of "thinking" in the Motion for Summary Judgment for the purposes of performing an analy-

sis under the Mondzelewski precedent and for the close relation of "thinking" to the major life activity of "working." Defendant thereafter addressed the Plaintiff's "thinking" argument in its reply and the Plaintiff again addressed this issue in his sur-reply. In order to be thorough and to address the actual issue raised by Defendant the Court will not end its inquiry concerning the issue of whether Plaintiff is disabled under the ADA without first addressing the "working" issue.

and think renders him unable to do a broad class of jobs which the average person in the general population with similar training, knowledge, skills, or abilities can perform with little or no difficulty." Plaintiffs' Brief, p. 25.

The Court will deny the motion for summary judgment on the Defendant's argument that the Plaintiff was not substantially limited in the major life activity of working prior to July 24, 1999 for two reasons. First, the undisputed material facts for purposes of this motion are once again contradictory regarding this issue. Among those facts are the Plaintiff's admission that his depression did not affect his performance of "essential" job functions and the Plaintiff's continued performance of work duties through July 23, 1999 compared to Plaintiff's driving to the wrong location to videotape a commercial and inability to write scripts of seventy-five words absent an environment without interruptions. The undisputed material facts contradict themselves as to the question of the Plaintiff being substantially limited in his ability to work. These contradictions are compounded by the absence of undisputed facts for the purpose of this motion regarding the Plaintiff's abilities to work in a class of jobs or broad range of jobs in various classes from his hiring until July 24, 1999. Viewing the undisputed material facts, and the inferences to be drawn therefrom, in the light most favorable to the Plaintiffs, these facts do not establish the requisite factual background as to the Plaintiff's alleged unrestricted abilities in a class of jobs or a broad range of jobs as contended by the Defendant. Therefore, these areas remain disputed issues of material fact to be determined by a jury.

The second reason for the Court's decision to deny summary judgment on this point is that the Plaintiff's counter-argument on this issue relies upon the Plaintiff's inability to "think" which is an issue still in dispute as indicated in our analysis above. The Plaintiffs' argument injects the issue of "thinking" in response to the Defendant's motion based upon "working." Since "thinking" is in dispute and can affect the ability to work as well, the issue of "working" also remains in dispute.

*" . . . record of . . . "*

■ The Defendant also argues that the Plaintiff has failed to demonstrate that prior to July 24, 1999 he had a record of an impairment that substantially limits a major life function. Plaintiff counter-argues that the April 20, 1999 letter from Dr. Silverman to the Defendant and the Defendant's reactions thereto demonstrate that the Defendant "perceived Plaintiff as being substantially limited in the major life activities of thinking and working." Plaintiffs' Brief, p. 26.

The Third Circuit in *Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 513 (3rd Cir.2001) has found: "A plaintiff attempting to prove the existence of a 'record' of disability still must demonstrate that the recorded impairment is a 'disability' within the meaning of the ADA." The Defendant's argument is that Dr. Silverman's letter does not establish "any substantially limiting impairment." Defendant's Brief, p. 6.

Dr. Silverman's letter is a cursory assessment of the Plaintiff's illness that indicates an "exacerbation of symptoms" after February 2, 1999 which required medication; the letter requests accommodations from the Defendant for the Plaintiff and addresses the potential for future hospitalization or the need for medical leave from the Plaintiff's employment. Plaintiff's Exhibit 6 (Document No. 51). However, the letter begins with Dr. Silverman stating that the Plaintiff is "a high-func-

tioning person capable of sophisticated work in a number of areas" *Id.* While not a typical medical record, such as a medical chart, the letter from Dr. Silverman sets forth the Plaintiff's illness and an assessment of its severity and the need for medications and a request for accommodations to facilitate recovery. The letter discloses a medical condition that would otherwise be kept confidential. Therefore, it appears to be an acceptable document to qualify as a "record" as set forth in 29 C.F.R. § 1630.2(k), App.

Although the letter contains contradictory evidence of the severity of the impairment and whether such impairment substantially limits a major life activity, the content of the letter as to the issue of "disability" is sufficient to establish this issue as a disputed issue of material fact. Therefore, summary judgment on this issue is denied.

### *"... regarded as ..."*

■ The Defendant argues that the Defendant's request for some type of medical documentation in support of the Plaintiff's request for accommodations and the Defendant's following actions in permitting the Plaintiff to work at home approximately one workday each week do not establish that the Defendant regarded the Plaintiff as possessing an impairment that substantially limits one or more major life activities. Plaintiffs argue that the Defendant's actions in calling the Plaintiff "crazy" or "nuts", hiring a replacement for the Plaintiff, "demoting him, constructively discharging him, pressuring him to resign, posting his job, and admitting he was disabled then telling him he should be 'grateful for their willingness to help him get well' all show that Defendant perceived Plaintiff as being disabled." Plaintiffs' Brief, p. 27.

■ The Third Circuit has recognized that there are three means of demonstrating that a person is "regarded as" having an impairment: 1) "despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities;" 2) "the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities;" or 3) "if he or she '[h]as a physical or mental impairment that substantially limits major life activities' only as a result of the attitudes of others toward such impairment." *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 514 (3rd Cir.2001). The Third Circuit in *Tice* also indicated that "an inquiry into how an employee was 'regarded' is necessarily quite fact-specific, and all of the surrounding circumstances may be relevant in reaching a conclusion." *Id.* at 515. "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel University*, 94 F.3d 102, 109 (3rd Cir.1996). In establishing that an employer regarded an employee as having a disability, the employee must demonstrate that the employer regarded the employee as having a disability that if real would substantially limit a major life activity. *See Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 514 (3rd Cir.2001)(finding that "substantially limits" applies in the same manner throughout the ADA statute); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489–493, 119 S.Ct. 2139, 2149–2151,144 L.Ed.2d 450, 466–469 (1999).

The Plaintiff is alleging substantial limitations in the major life activities of thinking and working. The undisputed material facts for this motion do not rise to the level of demonstrating a lack of a genuine issue

of material fact which would justify entering summary judgment. The Defendant was aware of the Plaintiff's depression through receipt of Dr. Silverman's letter. Comments made by supervisors and co-workers that the Plaintiff was "crazy" or "nuts" demonstrates an awareness of the Plaintiff's disease, but not a perception of a disability. *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 382 (3rd Cir.2002). However, undisputed facts present before the Court again contradict each other through the fact that in May 1999, after receiving the letter from Dr. Silverman, the Plaintiff was no longer writing scripts, but was just working essentially as a cameraman (possibly evidencing that the Defendant perceived the Plaintiff was unable to work at his old job, but was able to work at other jobs), while subsequently Robert Paterson said to the Plaintiff in June 1999 that he would be taking his place and the Plaintiff would no longer be employed with the Defendant (possibly evidencing the idea that the Defendant perceived that the Plaintiff was unable work in a class of jobs). Sparing further comparison of undisputed facts and the listing of the disputed facts and viewing the evidence in the light most favorable to the Plaintiff as the non-movant, the Court finds that whether the perception of the Defendant was such that it regarded the Plaintiff as substantially limited in his ability to think and work is a disputed issue of material fact, and, accordingly summary judgment is not appropriate.

## II. Was the Plaintiff a qualified individual with a disability even after July 24, 1999?

Defendant argues that based upon the evidence of record, the Plaintiff clearly was not "a qualified individual with a disability" after July 24, 1999 as he indicated that he could no longer work at his job, or more specifically, perform the essential functions of his job. The Plaintiff, who alleges constructive discharge as of July 23, 1999, argues that "[t]he adverse employment decisions were made prior to Plaintiff's second breakdown of July 24, 1999, when Defendant concedes that Plaintiff could do the job with or without accommodations. Therefore, Plaintiff is still a qualified person with a disability, even though he obviously now can no longer perform the job with or without accommodations." Plaintiffs' Brief, p. 33. Plaintiff further supports his position with the case of *Gaul v. Lucent Technologies,* 134 F.3d 576 (3rd Cir.1998) which found that in making the determination of whether a person is "a qualified individual with a disability", such determination is considered made at the time of the employment decision. *Gaul* at 580.

 The Court agrees with the Plaintiffs and the rule set forth in *Gaul* that in making a determination of the qualifications of a person with a disability, that determination must be made with regard to the time when the employment decision was made. Among the employment decisions alleged by the Plaintiffs to have been made by the Defendant were the failure to accommodate and the constructive discharge, and such conduct is alleged to have occurred between February 5, 1999 and July 23, 1999. At those times, the Plaintiff meets the two prong test found in *Gaul* defining "qualified individual with a disability" in that the Plaintiff possessed the requisite education, skills and background for his positions; and second, it is undisputed that he could perform essential job functions at this time with or without reasonable accommodation thus fulfilling the second element of the three element *prima facie* test for a viable claim under the ADA. *Gaul* at 580.

■ After the alleged discharge, which Plaintiff asserts resulted in his second nervous breakdown, it is undisputed from the evidence of record, *and not considering the evidence from the Social Security Administration's determination of disability,* that the Plaintiff could no longer work to perform the essential functions of his job.[4] The Defendant cannot be held liable under the ADA when any possible accommodation that could have been given from July 24, 1999 until today would still not allow the Plaintiff to return to work. The Plaintiff must be able to perform the essential functions of his job, with or without accommodation. Under either situation, the Plaintiff cannot perform his previous job with the Defendant. Although it may be true that the acts of the Defendant resulted in his inability to perform such functions, such liability theoretically attaches to those previous decisions resulting in the second nervous breakdown.

The failures to accommodate the Plaintiff and his constructive discharge are all alleged to have occurred when the Plaintiff could perform the essential functions of his employment, with or without accommodation. Any alleged discrimination against the Plaintiff occurring during a period of time when no accommodation would permit the Plaintiff to perform the essential functions of his job legally fails to establish a *prima facie* ADA claim. The quotation from the Plaintiffs' Brief, page thirty-three, reproduced above admits as much in saying that he is incapable of performing his job duties with or without accommodations. This is in accord with cases serving as precedents. *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104 (9th Cir.2000); *Webb v. Clyde L. Choate Mental Health and Development Center,* 230 F.3d 991 (7th Cir.2000).

On this issue, summary judgment is granted for the Defendant as there is no genuine issue of material fact regarding whether the Plaintiffs are able to make out a *prima facie* case under the ADA and the PHRA for the Defendant's actions subsequent to July 24, 1999; clearly they are not able to do so.

■ Before continuing, the Court must make one point in regard to the Plaintiffs' sur-reply permitted by the Court. The Plaintiffs argue in the alternative in their sur-reply that if the Court finds the Plaintiff not to be "disabled" under the ADA, then it should find that the Plaintiff has a claim for retaliation against the Defendant.

---

4. Although the Defendant raises the same issue found in *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) and *Motley v. New Jersey State Police,* 196 F.3d 160 (3rd Cir. 1999) that a determination of total disability under SSDI or a disability pension supports the conclusion that the Plaintiff cannot bring an ADA claim, the present issue is distinguishable and can be decided based on the Defendant's first argument that is unique to the facts of the case *sub judice.*

The Defendant's first argument (*see* Defendant's Brief, p. 14) points to three statements of undisputed fact in the case *sub judice* that demonstrate the Plaintiff fails to state a *prima facie* case under the ADA because the Plaintiff cannot establish he was a qualified individual with a disability. As a result, the Court does not reach the Defendant's additional argument (*see* Defendant's Brief, p. 14), a *Cleveland* issue, which compares the Plaintiff's statements and determination of disability under SSDI as supportive of the Plaintiff's inability to perform the essential functions of his job.

Another distinguishing factor between the case *sub judice* and *Cleveland* and *Motley* is that the statements found in the case *sub judice* are not conflicting like those found in *Cleveland* and *Motley.* Compare *Cleveland* at 805–807, 526 U.S. 795, 119 S.Ct. 1597, 1603–1604, 143 L.Ed.2d 966, 976–977 (1999) and *Motley* at 165–168 with Undisputed Facts, pp. 9–10, *supra* and Plaintiffs' argument, *supra,* p. 22.

■ The Court does not as a matter of right permit the filing of sur-replies, but such submissions are permitted if moved for by the Plaintiff and approved by the Court. The Court approved the filing of the Plaintiffs' sur-reply, but will not consider the Plaintiffs' alternative argument as to a retaliation theory for two reasons: 1) the Defendant is without the ability to rebut this new theory unless the Court would permit further briefing and filings by the parties in this matter; and 2) the retaliation theory under the ADA requires a differing analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) separate and apart from the Court's analysis set forth herein and such analysis was not mentioned or elaborated upon by the Plaintiffs in their sur-reply. To address this newly raised issue at such a late juncture in the proceedings when the pre-trial conference in this matter is to be held in approximately two weeks would not allow for the full briefing, and responses and replies thereto required of this separate issue.

Our decision not to consider this portion of the Plaintiffs' sur-reply is not without precedent. *See McDaniel v. Mississippi Baptist Medical Center*, 869 F.Supp. 445, 453 (S.D.Miss.1994)(denying consideration of new arguments in rebuttal memorandum that were filed two days before a pre-trial conference and to which the plaintiff could not provide an adequate response). Since the briefing on the motion for summary judgment has concluded, and further briefing on this issue would be the only fair means of addressing the Defendant's inability to rebut the Plaintiffs' new theory and such briefing would require addressing a new theory under a different analysis, the Court will not consider the Plaintiffs' theory of retaliation as raised for the first time in a sur-reply to the Defendant's summary judgment motion in light of the time and briefing necessary to address this issue in an adequate manner prior to trial.

### III. Was there discrimination against the Plaintiff by manner of failure to accommodate?

■ The Defendant argues that even if the Plaintiff did have a disability prior to July 24, 1999, he was not discriminated against because he was reasonably accommodated after a request for accommodations was raised in the April 20, 1999 letter from Dr. Silverman. Defendant argues that it implemented all of the suggested accommodations provided by Dr. Silverman and engaged in an interactive process. According to the Defendant, the Plaintiff's requests for accommodation based upon his friction with Manning were not referred to in Dr. Silverman's letter, that the accommodations given would be implemented for ninety days and then re-evaluated, and that re-assignment away from Manning would not be reasonable in light of *Gaul*, wherein a request for transfer from co-workers who had caused "prolonged and inordinate stress" to the plaintiff was an unreasonable request. *Gaul v. Lucent Technologies*, 134 F.3d 576, 581 (3rd Cir.1998).

The Plaintiff counter-argues that there was no need to request an accommodation in the form of a reassignment of the Plaintiff away from Manning because Manning was not his supervisor and that he had separately requested that Manning's conduct toward him be stopped. Plaintiff also argues that he requested accommodations on many occasions from February 5, 1999 until April 20, 1999 when the letter from Dr. Silverman was sent. Referring to the Defendant's subsequent conduct in not permitting him the agreed upon six to eight hours each week to work at home after May 11, 1999, calling him "nuts" and "crazy", along with a host of other conduct

as additional support, the Plaintiff argues that the Defendant did not engage in the interactive process to determine the appropriate accommodations for the Plaintiff but had acted in bad faith.

Discrimination occurs under the ADA when an employer knows of a employee's physical or mental limitation, the employee is a qualified person with disability and the employer does not make a reasonable accommodation for that person, unless the accommodation "would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The employee must make a request to the employer for an accommodation and in order to determine the reasonable accommodation best suited to the situation, the employer and employee have a duty to engage in an interactive process. *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 330 (3rd Cir.2003)(citing 29 C.F.R. pt. § 1630, app. 1630.9 at 359 and *Mengine v. Runyon*, 114 F.3d 415, 420 (3rd Cir.1997)).

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 319–320 (3rd Cir.1999).

From the undisputed facts, it is clear that no notification of disability based upon the Plaintiff's depression, or a request for an accommodation thereof, was made as early as alleged by the Plaintiff; the February 5, 1999 letter is in the vein of requesting a supervisor to remedy verbal abuse and harassment made toward the Plaintiff rather than a request for accommodation or an indication of a disability other than the Plaintiff's previous heart surgery three years prior to the letter. It appears from the undisputed facts that the first notification of the disability and request for accommodations was made to Magill on March 8, 1999 and the Plaintiff's second request for accommodations was made by means of Dr. Silverman's letter of April 20, 1999.

Nevertheless, whenever the initial request for accommodation was made and the interactive process begun, the undisputed facts support the Plaintiff's argument that the accommodation of working at his home for six to eight hours a week was dictated to the Plaintiff, thus evidencing a lack of good faith on the part of the Defendant in engaging in the interactive process. Also, Dr. Silverman was never contacted by any representative of the Plaintiff to discuss the Plaintiff's needs. These undisputed facts referred to by the Plaintiff establish sufficient evidence to rebut the Defendant's motion for summary judgment on this point in that it is in dispute whether the Defendant engaged in an interactive process that was flexible and involved both it and the Plaintiff. *See Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 771 (3rd Cir.2004)(finding that the interactive process requires participation of both employer and employee). In addition, material facts remain in dispute concerning the issue of whether the accommodation that was offered was indeed permitted to be used and if the accommodation was in fact reasonable under the circumstances. On this issue, summary judgment is denied.

### IV. Was the Plaintiff subjected to constructive discharge under the ADA?

The Defendant argues that the Plaintiff was not subject to constructive

discharge for three reasons: 1) the goals and objectives given to the Plaintiff by Watkins were not because of the Plaintiff's disability, but the "Career Path Proficiency Program (CPP)"; 2) Plaintiff's employment was not terminated and he did not resign on July 23, 1999 as he was on medical and disability leave and remained on the Defendant's employment rolls when the division at which the Plaintiff was employed was acquired by another company; and 3) the CPP goals cannot objectively be considered to have created "intolerable working conditions." Defendant's Brief, pp. 12–13. Defendant further argues that the presentation of the CPP goals was not in any way linked to the Plaintiff's alleged disability, but in fact Watkins, who presented the CPP goals to the Plaintiff, wanted to see the Plaintiff succeed. Defendant's Reply, pp. 9–10. For a claim of constructive discharge, "[s]pecifically, a court must determine 'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3rd Cir.2001)[5]; *see also Martin v. Allegheny Airlines, Inc.*, 126 F.Supp.2d 809 (M.D.Pa. 2000). "[N]o finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3rd Cir.1984).

Once again conflict exists among the disputed facts and among the undisputed facts. As to the Defendant's argument that the Plaintiff never resigned, this fact remains disputed from the record. Should it be proven at trial that the Plaintiff never resigned, contrary to his allegations in his constructive discharge theory, the cause of action based upon this theory *could* be dismissed under a motion for judgment as a matter of law. Among the undisputed facts, the testimony of the Plaintiff indicates both 1) that the CPP goals were presented in such a manner that they were a "final warning" and 2) that he also has testified that Watkins indicated that he wanted the Plaintiff to meet these goals and remain in his employment with the Defendant. *See* p. 8, *supra.* It is also noted that the Defendant hired a replacement for the Plaintiff and, contrary to the Defendant's contention, this statement is permitted to be considered even though it is hearsay, so long as it is capable of admissibility at trial.[6] *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.* 998 F.2d 1224, 1234–1235 n. 9 (3rd Cir.1993); *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 223 n. 2 (3rd Cir.2000). However, the Court does agree that the circumstances occurring after July 23, 1999 have no relevance to the determination of constructive discharge allegedly occurring on that date.

The Plaintiffs specifically refer to the presentation of CPP goals and the com-

---

**5.** Although *Duffy* concerns a claim made under the ADEA, its analysis of constructive discharge is applicable to the ADA. *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 666.

**6.** This fact statement regarding the hiring of a replacement for the Plaintiff will be admissible at trial if Robert Paterson, who allegedly made the statement, is brought to trial by the Plaintiffs to testify as to such fact, or, in the event Robert Paterson is not called as a witness at trial, then if such statement is proven to be an admission of a party-opponent under F.R.E. 801(d)(2), or other applicable rule of evidence, such statement may be admitted.

ment from Robert Paterson as evidence of the constructive discharge in their complaint. If a decision was made by the Plaintiff to leave on a date later than July 23, 1999, then all occurrences prior to that later date would be relevant. Still, the Plaintiff never returned to work after July 23, 1999 and the Court finds no relevance with regard to later occurrences concerning the Plaintiff's decision to claim constructive discharge on that date. With most of the remaining facts in dispute as to the issue of constructive discharge and some of the undisputed facts being in conflict, this matter is a factual inquiry for the jury. Summary judgment is denied on the issue of constructive discharge.

## V. Is the Plaintiffs' claim for intentional infliction of emotional distress viable?

The Defendant challenges the Plaintiffs' claims based upon the tort of intentional infliction of emotional distress on three fronts: failure to file the claim within the statute of limitations, lack of outrageousness in the actions alleged, and that the claim is barred by the exclusivity provisions of the Worker's Compensation Act as the actions alleged were entirely work related. Plaintiff counter-argues that the statute was tolled until January 18, 2000 when the Plaintiff filed his claim for social security disability, as that was the date when he knew of his injury and that it was caused by the Defendant.

■ Under Pennsylvania law, a two year statute of limitations and the discovery rule apply to claims of intentional infliction of emotional distress. *Johnson v. Provident Nat. Bank,* 700 F.Supp. 817 (E.D.Pa.1988). "The statute begins to run when the injured party [sic] 'possess sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he

is entitled to redress.'" *Haggart v. Cho,* 703 A.2d 522, 526 (Pa.Super.1997) (citations omitted).

■ The Court does not agree that the date the Plaintiff chose to file for social security disability benefits should also be considered to be the date he knew of his injury. As was argued by the Plaintiffs in their brief on a previous issue, the definitions of disability under the ADA and the Social Security Act do differ and also the fact of application for disability does not equate with the timing of knowledge of an injury. From the undisputed facts of record, it is the Court's finding that the Plaintiff was aware of an injury to his mental health on February 2, 1999, the date of his first mental breakdown. After the date of this first mental breakdown, the Plaintiff approached Cross about Manning's behavior and the fact that it could result in another nervous breakdown. A second nervous breakdown did occur on July 24, 1999. Between these two dates, the Plaintiff approached supervisors employed by the Defendant and sought accommodations to prevent further injury. It is clear from the facts that the Plaintiff was aware of the stress allegedly being placed upon him by the conditions at his workplace and the possibility for further injury.

Therefore, the acts and circumstances resulting in the nervous breakdown on February 2, 1999 are not preserved by the discovery rule for prosecution outside of the applicable statute of limitations. However, those acts occurring on and after February 2, 1999 and leading up to the second nervous breakdown on July 24, 1999 are preserved by the discovery rule. This is so because the nervous breakdown of July 24, 1999 was the injury giving notice to the Plaintiff that the acts from February 2, 1999 forward had a detrimental effect on his mental health. The filing of the Plaintiffs' complaint on July 19,

2001, was timely and permitted the Plaintiffs to pursue a claim for intentional infliction of emotional distress founded upon the acts from February 2, 1999 forward. This is because the acts from February 2, 1999 forward were not noticed to have affected the Plaintiff until July 24, 1999. The Court will now evaluate if the nature of the acts from that date are work-related.

For the Plaintiffs to recover on their claim of intentional infliction of emotional distress and avoid the bar to recovery under the Workers Compensation Act, they must demonstrate that Plaintiff was subject to injury unrelated to a third-party injury. 77 P.S. § 411. Personal animosity not originating from the employer-employee relationship can be the basis of a common law suit and is not precluded by the exclusivity of the Worker's Compensation Act. *Dolan v. Linton's Lunch,* 397 Pa. 114, 152 A.2d 887, 889–890 (1959). Many of the disputed facts reveal that the acts complained of by the Plaintiff revolved around employment related matters and issues. But in viewing the facts in the light most favorable to the Plaintiffs, as the non-movants, some of these facts can be viewed as relating to personal animosity, including Magill's alleged swearing at and hanging up the telephone on the Plaintiffs as well as Magill's failure to give the Plaintiffs the correct telephone number needed to file a disability insurance claim. In addition, Manning used profanity toward the Plaintiff; although most of the complaints the Plaintiff had concerning Manning occurred prior to and including February 1999. Thereafter, the Plaintiffs' complaints focus mainly upon the actions of Magill, Cross and Watkins. Viewing these actions by reading a cold record makes it difficult to determine the vein in which they were made. Opposing counsel are obviously going to argue that they are to be characterized in a way most beneficial to their respective clients. Therefore, it remains a disputed issue of material fact as to the motivation for the words and actions of the said employees of the Defendant from February 3, 1999 forward. Summary judgment is therefore denied upon this issue.

The Court will now proceed to evaluate the outrageousness of the conduct alleged.

To make out a claim of intentional infliction of emotional distress, the plaintiff must show conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be intolerable in a civilized community.' ... [I]t is the conduct which must be outrageous, not the reaction to that conduct, to create a cause of action for intentional infliction of emotional distress.

*Jacques v. AKZO Intern. Salt, Inc.,* 422 Pa.Super. 419, 619 A.2d 748, 754 (1993)(*abrogated on other grounds as recognized in Kroptavich v. Pennsylvania Power and Light Co.,* 795 A.2d 1048, 1055 (Pa.Super.2002)). "[I]t is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery." *Reimer v. Tien,* 356 Pa.Super. 192, 514 A.2d 566, 569 (1986). In defining the outrageous conduct requirement, the Pennsylvania Superior Court has stated:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa.Super.1997) (citations omitted). This tort is further summarized as follows:

> To create a cause of action for intentional infliction of emotional distress, it is the conduct of the defendant that must be outrageous and not the reaction of the plaintiff to the conduct of the defendant. This standard also plainly anticipates a level of misconduct far beyond the indignities and insensitivity that too often taint our daily lives, such as carelessness, callousness, or nonabusive overreaching. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities; people are expected to be hardened to a certain amount of rough language or occasional inconsiderate or unkind acts, and there is no occasion for the law to intervene in every case where someone's feelings are hurt.

> Nor is recovery under this theory available to every plaintiff who has suffered mental distress as a result of the defendant's otherwise wrongful conduct. It is not enough that the defendant acted with an intent which was tortious or even criminal, or that the defendant intended to inflict emotional distress, or even that the defendant's conduct was characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

SUMMARY OF PENNSYLVANIA JURISPRUDENCE 2D, TORTS § 10:23 (2004)(footnotes omitted).

 In reviewing the facts from February 2, 1999 forward, as portrayed by the Plaintiffs in their Response to Movant's Statement of Undisputed Material Facts (Document No. 51), and if the Court assumes all of these facts as alleged to be correct, the actions recounted would not cause an average member of the community, nor do they cause this Court, to exclaim, "Outrageous!" The following list includes most of the actions alleged to have occurred to the Plaintiff that are relied upon in support of his claim for intentional infliction of emotional distress: profanity directed toward the Plaintiff and the accompanying verbal abuse by supervisor, the alleged failure to accommodate, the transferring of the Plaintiff to work under Manning who verbally harassed him with epithets using the "f——" word along with other harassment by comparing him with Manning's elderly father, demotion (without loss of pay), hiring a replacement for the Plaintiff while he was still employed with the Defendant, backdating the FMLA paperwork (an act which is permissible under the FMLA, *see* 29 U.S.C.A. § 2612(d)(2)), giving the Plaintiffs incorrect telephone numbers for the filing of a disability claim, threatening Plaintiff to "shape up or ship out", disconnecting Plaintiff's voice mail at work, teasing the Plaintiff about his physical appearance, not providing documentation for disability insurance to the Plaintiff, providing false information to the disability insurance carrier indicating the Plaintiff did not enroll in the program when in fact he did, and Manning calling the Plaintiff "crazy" and "nuts". These actions as recited by the Plaintiff are certainly rude, callous and insensitive in a work atmosphere, but they do not reach the *extreme* level of outrageous required for an intentional infliction of emotional distress cause of action.

The fact that the Plaintiff was ridiculed and sworn at does not equate to outrageousness for the purposes of an intentional infliction of emotional distress cause of action. The conduct of Manning, Cross, Magill and Watkins could be considered malicious, but not outrageous for purposes of this particular cause of action. Even if done intentionally, as alleged, the conduct does not go as far as to be termed "outrageous." Mistreating someone based upon

their disability is certainly rude and unacceptable behavior, and is not permissible under the ADA, but such actions do not equate with the extreme and outrageous conduct necessary to maintain an action for intentional infliction of emotional distress. Such disturbing conduct must be viewed objectively, and with that view the conduct to which the Plaintiff was subjected is not acceptable, but in the same vein, it is not beyond all bounds of decency in our society to an extent to be termed outrageous and atrocious beyond all bounds of decency. Such a designation must be reserved only for the most egregious conduct which cannot be tolerated in a civilized society. The alleged conduct in this case, taken as a whole, comes close to being outrageous but falls short of that rigorous standard.

 Additionally, the conduct allegedly directed toward the Plaintiff–Spouse is itself limited: Magill telling her that her husband had to come to the telephone or be terminated, giving her the wrong telephone number to be used in filing a disability claim, and hanging up the telephone on the Plaintiff–Spouse. While in all senses this conduct would be considered rude, boorish and unacceptable under the circumstances, it does not legally constitute extreme, atrocious and outrageous conduct.

Summary judgment is therefore granted as to the claims of intentional infliction of emotional distress of the Plaintiff and the Plaintiff–Spouse in that there is a lack of any genuine issue as to any material fact on the claims of intentional infliction of emotional distress and the undisputed facts demonstrate that Defendant is entitled to judgment.

### VI. Loss of Consortium Claim and Punitive Damages Claim

 Claims for loss of consortium are derivative of the spouse's claims and to the extent that such claims are dismissed, so must the claims for consortium be dismissed. *Scattaregia v. Shin Shen Wu*, 343 Pa.Super. 452, 495 A.2d 552, 554 (1985). Since both claims of intentional infliction of emotional distress are dismissed in accordance with the foregoing analysis, their accompanying claims for loss of consortium are also dismissed. Likewise, when an underlying cause of action is dismissed, the accompanying claim for punitive damages must also be dismissed. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 802–803 (1989). Therefore, since the causes of action for intentional infliction of emotional distress have been dismissed, the accompanying claims for punitive damages are also dismissed.

**AND NOW,** this 17th day of March, 2005, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT:

1) the motion for summary judgment is DENIED as to Counts I and II (ADA and PHRA) and the theories alleged therein, for all of the Defendant's actions alleged to have occurred up to and including July 24, 1999;

2) the motion for summary judgment is GRANTED as to Counts I and II (ADA and PHRA) and the theories alleged therein, for all of the Defendant's actions alleged to have occurred after July 24, 1999; and

3) the motion for summary judgment is GRANTED as to Counts III (Intentional Infliction of Emotional Stress of both the Plaintiff–Husband and Plaintiff–Wife), IX (Loss of Consortium) and X (Punitive Damages).